E-FILED
Wednesday, 27 March, 2019  11:38:31 PM
Clerk, U.S. District Court, ILCD

## IN UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

Ms. C.

v.

University of Illinois, Champaign Urbana;
Bd. of Trustees of Univ of. Ill.; Robert J.
Jones, Chancellor UIUC, Alma Sealine, Dir.
of Univ. Housing; Justin Brown, Assoc.
Dean of Students, Patricia Anton, Assoc.
Dir. Univ. Housing, Robert Wilczynski,
Ass't Dean of Students; Lowa Mwilambwe,
Assoc. Vice Chancellor; Rony Die, Ass't
Dean of Students; Jim Rooney, Univ.
Housing Conduct Officer (retired); Kim
Soumar,  Program Dir. Office of Student
Conflict Resolution, Pat Malik, Dir. of
Disability Resources and Educational
Services (DRES); Teresa Davenport, DRES
Access Specialist; Laura Haber,
Allen Hall Program Dir.; Loren Israel,
Univ. Counsel and Bias Assessment and
Response Team

No. _____

JURY TRIAL DEMANDED

## COMPLAINT

Ms. C., Plaintiff, complains under 42 U.S.C. § 1983 that the University of Illinois at Urbana-

Champaign (UIUC); the Board of Trustees of the University of Illinois; Alma Sealine, Univ.

Housing Director, in her official and individual capacities; Patricia Anton, Associate Housing

Director, in her individual and official capacities; Robert Wilczynski, Assistant Dean of Students

and Assistant Director of Housing, in his official and individual capacities; Lowa Mwilambwe,

Associate Vice  Chancellor, in his official and individual capacities; Rony Die, Assistant Dean of

Students, in his official capacity; Jim Rooney (retired) Associate Director of Housing, in his

official and individual capacities; Justin Brown, Associate Dean of Students, in his official

capacity; Kim Soumar, Program Director Office of Student Conflict Resolution (OSCR), in her

official capacity; Theresa Davenport, Access Specialist, Disability Resources and Educational

Services (DRES), in her official capacity; Pat Malik, DRES Director, in her official capacity;

Laura Haber, Allen Hall Program Director, in her official and individual capacities; Loren Israel,

University Counsel, OSCR, and Behavioral Assessment & Response Team (BART);

collectively, Defendants:

> (1)  violated Plaintiff's due process under the Fourteenth Amendment process, and (2)
>
> under the First and Fourteenth Amendments to freedom of speech and association; (3)
>
> discriminated against her because of disability (autism, prosopagnosia, scoliosis) and
>
> (4) failed to accommodate her disabilities in violation of Section 504 of the
>
> Rehabilitation Act, 29 U.S.C. § 794,  Title II of the Americans with Disabilities Act
>
> (ADA), 42 U.S.C § 12132, et seq. and under the Fair Housing Act (FHA), 42 U.S.C.
>
> 3603 & 3604, and associated guidelines, adopted and incorporated by contract; (4)
>
> committed assault by putting her in fear of a battery; (5)  intentionally inflicted
>
> emotional distress by illegally attempting to evict her, repeated dismissal on spurious
>
> grounds, forced to move because of unlawful No Contact Directives. (6) breached
>
> state contract law by disability discrimination and failure to reasonably accommodate
>
> as well as by breach of lease contract.

## **OVERVIEW**

Defendants canceled Plaintiff's contract with university housing without due process on

March 2017, thereby violating § 504 and the FHA (among other housing discrimination), and

caused extreme emotional distress by threatening her with immediate eviction and homelessness.

They also violated her due process rights by twice "dismissing" her from the University on

spurious grounds, once using evidence they were not entitled to have and again in a proceeding

tainted by secret evidence and ex parte communications. These dismissals and damage to her reputation have affected her lifetime income prospects, reducing the likelihood that she will be able to pursue sort of career she would like or anything as remunerative.

Defendants violated Ms. C's first amendment rights to freedom of speech and association and also caused extreme emotional distress by initially imposed a 100-foot no-trespass order that included all University housing and dining services, reduced after appeal to 50 feet, around her original home Allen Hall, and issued a No Communication Order or No Communication "Directive"(NCD) against Plaintiff, with respect to student Rachel Christie, and later student Suda Rao. From March through Sept. 2017, Defendants forbade her speak on certain topics or identify herself with certain ways on penalty of dismissal from UIUC, barring her from various public forums, violating her rights to freedom of speech on pain of dismissal from the university. On May 25, 2018, Defendants barred Plaintiff from University resource centers except for events only and only with prior permission, to enforce the unlawful NCD, violating freedom of association.

Defendants violated Plaintiff's rights to be free from disability discrimination on multiple occasions by refusing to acknowledge her disabilities, unlawfully requiring written medical proof of disability, and refusing to accommodate them. When  she provided such proof in Aug. 2018, they refused to accept it, from March 2017 through Oct. 2018, and then, despite the letter, rejected the professional diagnosis they had illegally demanded on the say-so of a lay student, Rachel Christie, and denied Plaintiff. the accommodations they themselves had previously offered, as "unreasonable." These actions violated her rights under § 5 of the Rehabilitation Act, and her rights, secured by contract, under the ADA and the FHA.

UIUC, through Dean Patricia Aton, assaulted Plaintiff at a University Residence Hall Function, causing her great anguish and extreme emotional distress, including symptoms of PTSD, which a UIUC psychologist refused to officially and formally diagnose as it "could be used against UIUC." The entire course of conduct described was extreme and outrageous, foreseeably causing extreme emotional distress. Defendants also breached their contract with her, causing her direct financial losses, and the unlawful dismissal affected her lifetime income expectations.

## JURISDICTION AND VENUE

This Court has jurisdiction over this action under 28 U.S.C. § 1331 because it arises under 42 U.S.C. § 1983, the First and Fourteenth Amendments, and 29 U.S.C. § 794. Supplemental  jurisdiction exists under 28 U.S.C. § 1367 for Illinois breach of contract claims under the ADA, 42 U.S.C § 12132. et seq., the FHA, Secs. 803, 804, and accompanying Guidance, adopted by UIUC by contract, Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g (FERPA); 34 CFR Part 99; and for intentional infliction of emotional distress, battery, and breach of contract. The complained-of conduct with respect to state and federal claims arises from a common factual nexus. Venue in this District is proper, because all or a substantial part of the events or omissions giving rise to the claim occurred in the Central District of Illinois, see 28 U.S.C. § 1391.

## FACTUAL AND PROCEDURAL BACKGROUND

1. The University of Illinois at Urbana Champaign (UIUC) is a state institution of higher education, located in Urbana Champaign, and which receives federal funds.

2. Ms. C. (Plaintiff) was a student at UIUC from August 2015 through December 2017.

3. Plaintiff identifies her sexual orientations as kinkster, polyamorous, and lesbian. Plaintiff was at all relevant times President of the official University student club or

organization kinkster/poly/sexuality   (Students for Alternative Sexuality, Safety, and Consent) (SASSC, pronounced "sassy"), officially affiliated with the UIUC LGBT center.

4. Plaintiff has been diagnosed with the following disabilities, among others. Autism (Asperger's) Spectrum Disorder (1995) (resulting in an inability to understand nonverbal communication), Adult Degenerative Scoliosis (2008) (extreme curvature of spine, resulting in pain and mobility issues), and Prosopagnosia (2018) (inability to recognize faces, names,, and often voices).

5. UIUC Student Code (Code) 1-104(a) grants students in University Housing the same protections and rights as any other US citizen. The Code (attached) is a contract between students and the University.

6. UIUC is contractually obligated to uphold all federal discrimination law including the FHA, ADA, ADAAA, Rehabilitation Act, Title II, Title VII, Title IX. Code 1-108.

7. UIUC is contractually obligated to practice and uphold nondiscrimination based on ability status, race, sex, sexual orientation, age, or other personal identity factors.

8. Defendants investigated a possible or suspected violation of the Code, and while failing to find a Code violation

9. In early March 2017, Rachel Christie, student Multicultural Adviser at Allen Hall, and Suda Rao, student Resident Adviser at Allen Hall, both University employees, reported Plaintiff for "sharing or [publicly] using an electrotherapy massager [or] TENS unit" (TENS unit) … "consensually" and they "inferred that it was a sex toy" because of Plaintiff's claimed orientations. It was not.

10. March 8, 2017 Plaintiff met with Sam Holden, Resident Director of Allen Hall, to discuss concerns that Plaintiff was "sharing a sex toy" with residents or using it publicly. Plaintiff informed Holden that the device in question was a handheld TENS Unit. Holden then sent a letter to Plaintiff  in which this point was stricken from the list of complaints against her.

11. On March 22, 2017, Defendant Patricia Anton, Associate Director of University Housing, requested an emergency meeting with Plaintiff for March 27, 2017. At this meeting Anton handed Plaintiff a letter stating her housing contract was being cancelled due to "engaging in sexually explicit conversations" and putting "intense drain" on housing staff. Plaintiff was not given notice. She clarified in person that "engaging in sexually explicit conversation" amounted to identifying herself publicly as a "kinkster" and a "polyamorist." Anton instructed Plaintiff she was not permitted to claim these as "orientations," because these are "behaviors" and she was not to talk about them publicly. Putting an "immense drain" on staff was clarified as asking the residence director "55 questions over 3 semesters." Anton refused to put these clarifications in writing or to put further explanation in writing. Anton claimed that by asking about being in trouble and needing a new home, Plaintiff admitted that she "knew what she did wrong." The Contract Cancellation Letter (Eviction Letter) was sent to University Police.

12. The Eviction Letter of March 27, 2017 gave Plaintiff until 5:00 p.m. on March 29, 2017 (two days) to move out of her residence hall. It included a 100 foot No Trespassing order for all University Housing, including dining halls. The letter stated that if she violated this order, she would be arrested.

*13.* On March 27, 2017, present counsel contacted University Counsel Loren Israel and

said  the University "was kicking out a highly at-risk individual, someone who is

transgender, disabled, and otherwise homeless, with almost no due process, subjecting

her to a potential death sentence." Israel responded that this *was "known and*

*intentional."*

14. On March 28, 2017 Plaintiff timely submitted an appeal drafted by counsel as

instructed by the Eviction Letter. Counsel also submitted a Proposed Settlement.

15. Plaintiff's appeal was granted and gave Plaintiff three days to move to a new

Residence Hall across campus.

16. On March 28, 2017 Plaintiff was orally informed during a meeting with Associate

Housing Director Jim Rooney that the decision was based on disability status and her

age. Plaintiff was not allowed the interactive Process granted under § 504 and the

ADA. He stated, "I will not have a discussion with you, I am giving you your options

[among two residence halls or homelessness] and you can pick one."

17. Counsel emailed Israel on March 30, 2017, that UIUC must abide by the ADA and due

process. Loren emailed back March 31, 2017, falsely denying UIUC's prior

knowledge of Plaintiff's disabilities. Israel also stated that the placement was

"accessible to all of campus by multiple buses at that location." In fact, there is only

one adjacent bus route that only accesses the north side of campus. Israel also stated

that the room which Plaintiff was placed was an ADA room that granted the requested

accommodations. It was not.

18. Plaintiff had been moving their possessions since the eviction letter on foot one

suitcase at a time, in the rain, and was denied assistance in moving. After counsel's

exchange with Israel, UIUC offered Plaintiff a moving truck and the assistance of maintenance, which she accepted.

19. Plaintiff contacted counsel about their new room, Daniels 154, because it did not providing the claimed accommodations. University Housing denied this until counsel provided photographic evidence to University Housing. University Housing apologized for the "mistake" and moved Plaintiff into Daniels 150, the room next door.

20. On May 5, 2017, Plaintiff met with Dean Lowa Mwilambwe, Assistant Vice Chancellor for Student Affairs, to discuss disability discrimination and restriction of freedom of speech, as well as repeated exclusion from events. Mwilambwe stated that Plaintiff would otherwise be expected to behave like any other student, even though she was autistic, and that University Disability Resources and Educational Services (DRES) could "fix your behaviors." There is no medical or other "fix" for autism. Mwilambwe reasserted that kink and polyamory were not to be referred to as "orientations," only "behaviors", and were not to be openly discussed.

21. In response to Plaintiff's statement that she was protected by Freedom of Speech, either Anton or Mwilambwe stated that they "didn't care."

22. During Summer 2017, Plaintiff was forced to live off campus because Defendants, though Sealine, refused to honor her 12-month lease contract, stating that Plaintiff had only a 10-month contract. Later, in Oct. 2017, Defendants acknowledged that that they had "accidentally" offered Plaintiff a 12 month contract, which she had accepted, but said this was a mistake. By the time this was sorted out, it was after the fact. Plaintiff had paid UIUC for summer housing. The money was not refunded despite request,

23. On June 9, 2017, Plaintiff accepted offer to continue living in Daniels 150 in Fall 2017. Sealine promised Plaintiff in writing to allow her to attend events at Allen Hall.

24. During Summer-Fall 2017,  Plaintiff sought clarifications from Sealine about overbroad, vague, and inconsistent guidelines regarding expected behaviors, *e.g.*, "Don't have conversations that might make other people uncomfortable"; "Avoid explicit sexual conversations," including self-identification as kinky or poly, but identification as gay and trans was OK. Otherwise Sealine refused to discuss clarifications. Sealine repeatedly told Plaintiff to learn to "learn to read body language," "adjust your behavior to make other people comfortable," "get consent to talk or flirt with to people."

25. On August 4, 2017, Sealine wrote Plaintiff that she did "not wish to limit your freedom to discuss sexual matters," but "you should not engage in explicit sexual conversations [understood to include kink or poly, but not trans or homosexuality, because the latter and not the former were protected classes] without their consent." She also allowed Plaintiff to attend Allen Hall events with an escort but restricted her from all other Allen Hall locations and times.

26. On August 23, 2017, Dr. Brin Schuler, of McKinley Campus Health Center, added Plaintiff's TENS Unit to her school medical record as a medical device and not a sex toy.

27. On August 31, 2017 Plaintiff attended a program at Allen Hall with a friend and escort. Shortly into the program, Anton, who was not from Allen but from the other side of campus, approached Plaintiff, got within 5 inches of Plaintiff's face, and demanded aggressively, "What are you doing here?" When Plaintiff explained she was

there with Sealine's permission, Anton said "fine, but leave as soon as it's over." Plaintiff complained to Sealine the next day, who stated that staff have a right to question any person in a building. Plaintiff replied that Anton's aggressive behavior was in direct violation of three sections of the Code, that Anton came from across campus, and was not employed by or responsible for overseeing Allen Hall.

28. Since this encounter and others with Anton, Plaintiff has been suffering from symptoms of what a University psychiatrist subsequently informally diagnosed as symptoms of Post-Traumatic Stress Disorder (PTSD), but refused to write this diagnosis down and place in Plaintiff's record "since you could use it against the University."

29. Plaintiff then sought an NCD against Anton. OSCR claimed it could not offer a NCD between a student and a staff member. In fact, such orders are issued all the time.

30. At the end of August, 2017, Plaintiffs started a class where Rachel Christie and Suda Rao were also enrolled.  On September 1, 2017, University Housing Director and Dean of Students Robert Wilczynski issued Plaintiff a NCD regarding verbal communication for Rachel Christie, thus revealing to Plaintiff that Christie was one of the complainants in the initial complaint about the TENS unit. Plaintiff had not spoken with or otherwise contacted Christie since planning a meeting on November 10, 2016. Wilczynski also imposed a 50-foot No Trespass Order from Allen Hall.

31. Because this NCD required Plaintiff to recognize a person, on September 3, 2017, Plaintiff informed Wilczynski that she has Prosopagnosia or face-blindness, a disability which limits her ability to recognize people, and asked for accommodation.

Wilczynski demanded a written diagnosis and refused to engage in discussion about accommodation.

32. On September 7, 2017, Sealine sent Plaintiff an updated Letter (Sept. Letter) granting Plaintiff permission to use or share her TENS unit, to "flirt with consenting peers," identify kink and/or polyamory as orientations, and discuss sexual topics with peers "if they are already discussing sexual topics and consent to your joining."

33. On or before September 13, 2017. University Counsel Loren Israel learned of a lawsuit involving discipline to which Plaintiff had been subjected at McHenry County College (MCC). Israel reported these revelations to Brown, who reported them to Dean Rony Die.

34. On September 17, 2017 Plaintiff requested Disability Resources and Educational Services (DRES) for accommodation for Prosopagnosia in regard to the NCDs. DRES refused. Sealine, Director of University Housing, acknowledged her office was bound by the FHA and ADA, but refused to uphold Plaintiff's disability rights under these statutes without DRES's approval.

35. On September 25, 2017, Wilczynski updated the NCD to include Suda Rao. Plaintiff's last contact with Rao was the week prior to ask to speak to whoever was in charge of the Allen Hall LGBT club. Prior to that,  she had had no contact since early March, 2017, when Christie and Rao complained about the TENS unit.

36. Plaintiff arranged an emergency meeting with Wilczynski. During that meeting Wilczynski said he was closing the investigation in regard to Plaintiff's behavior, stating that "even if the complaints were substantiated, they would not be violations of the student code." During the meeting, Plaintiff discussed her Prosopagnosia, and

Wilczynski said that Christie and Rao "would be informed they should remind Plaintiff who they are if Plaintiff approaches them or seems to not recognize them." The letter was never sent. Wilczynski now denies making this promise. Wilczynski sent a follow-up disciplinary Letter ending the investigation but leaving the NCD and No Trespass Order in place due to "significant conflict" between Plaintiff and complainants.

37. On October 3, 2017, Rony Die wrote Plaintiff. accusing her of lying about discipline at McHenry County College (MCC), a prior institution, on her UIUC entry application in 2014 and not updating it before the first day of classes in 2015. Several of the incidents in question were expunged, and were not in Plaintiff's record. Plaintiff had not received official notice of any final determination by MCC by the first day of classes at UIUC.

38. On October 11, 2017, Plaintiff viewed her UIUC disciplinary files. The only complaints there involved her interaction with peers based on their age, the consensual sharing or personal use of her TENS Unit at two programs, her discussing her kink orientation, and her lack of understanding of body language due to autism, none of which were unlawful.

39. On October 17, 2017, Plaintiff had planned to meet up with a celebrity friend visiting the campus for programming. After arranging in person to meet at a local coffee shop, the friend messaged Plaintiff by SMS text that Laura Haber, Program Director at Allen, had directed her to not meet or communicate with Plaintiff.

40. On October 20, 2017, Plaintiff met with Die to discuss the allegations about failure to disclose prior discipline at MCC. Die requested permission to contact MCC and ask

about Plaintiff. Plaintiff refused. Die informed Plaintiff that he would still call but would only ask general questions and not name Plaintiff. In fact, it is clear that he asked questions about Plaintiff by name and received specific answers about her.

41. Some time later, Die called MCC about this. One of the recorded responses was "No, I am unaware of any expungements" to the question "Can records be expunged?" MCC expunges records all the time, so this was not a question about general policy.

42. In late October 2017, Plaintiff petitioned for Medical Release from housing contract to anxiety, depression, and other psychological reasons. During subsequent discussions with Sealine around this, Plaintiff stated that she had been charged for a full year, including Summer, during which she had had to move off-campus. Sealine stated that Plaintiff had not been not charged for Summer. When, after some back-and-forth, Plaintiff suggested settling the dispute in county court, Sealine admitted to the "mistaken overcharge." UIUC claimed that the amount in question was $282.00. In fact it was $2014.79, which was refunded after dispute. Plaintiff also asked Sealine about a housing refund if dismissed. Sealine said there would be no refund if Plaintiff were dismissed for "judicial reasons," suggesting that the hearing at UIUC was "judicial." In fact it was administrative, not judicial.

43. On November 3, 2017, Plaintiff attended  a hearing regarding dismissal from UIUC because of nondisclosure of previous discipline. Plaintiff disputed this, on the ground among others, that UIUC Code required an official notice that MCC had not provided until after the time required for disclosure, but Plaintiff was dismissed from UIUC for this in part because she had received an early unofficial email about the dismissal and so was on notice. The dismissal was upheld after appeal but held in abeyance until

Dec. 22, 2017 (end of semester), after which Plaintiff would no longer be permitted on any university property until readmitted.

44. On November 14, 2017, Plaintiff was invited to an LGBT event, called "Queersgiving," but the Director of the LGBT Resource Center suggested that Plaintiff could not attend due to the NCD because the hosts were Christie and Rao. Plaintiff stated that the NCD was not a keep-away order but only verbal, and she did not intend to speak with them. Wilczynski confirmed to the Director that the Order was verbal only. The Director suggested that Plaintiff arrange to have hosts notified. Plaintiff did this, but moments after Plaintiff was scheduled to arrive, but before she did, Wilczynski sent Plaintiff an email barring her from the event, "as it [was] not academic." The NCD did not state that there was a keep-away order for nonacademic events. Plaintiff left without entering the venue.

45. Over the rest of the fall Plaintiff was repeatedly instructed by University Staff and Registered Student Organization leadership to leave events "due to your behavior at Queersgiving," which Plaintiff did not attend.

46. On November 19, 2017, counsel sent University Counsel and named students and staff, including Christie, formal Cease and Desist demands regarding defamation of Plaintiff and barring her from events on and off campus, as well violations of Plaintiff's freedom of association with various third parties. Israel responded that Housing staff would be updated about the freedom of association claim. If they were, Plaintiff was not informed

47. In December 2017, Plaintiff informally requested that Dean Brown to sign a FERPA Release of Information to students regarding the September 25 finding that she had not

violated the Code. Brown refused to allow Plaintiff to release any information to students or even fill out a release form. Plaintiff told Brown about ongoing bullying and defamation that the Office of Student Conflict Resolution (OSCR) "did not care and would not do anything about students defaming another student, present or former." Plaintiff asked to report the bullying and harassment to the University Behavioral Assessment and Response Team (BART), deputed to deal with bullying and harassment among student, of which Brown, Wilczynski, and Israel were core members. She was denied permission to report the problems to BART.

48. As of Dec. 22, 2017, Plaintiff was not in school but living off-campus in Carbondale. The bullying, harassment, and defamation continued during visits to Champaign, but of course not to campus, where Plaintiff was barred from going and did not go. On January 13, 2018, counsel sent Christie, Rao, and C.J. Seymour formal Cease and Desist letters against further bullying and defamation during the Spring Semester.

49. On February 13, 2018, Plaintiff wrote to Brown to be permitted to release to Christie, Rao and other staff at Allen Hall Wilczynski's finding that she had not violated the Code and Sealine's affirmation of her free speech rights. On February15, 2018, Brown replied, "You asked to sign a release for all students, which we will not do. And even if you signed a release for Allen Hall staff, I would not share the information (a release does not compel sharing). And the section you cite does not apply in this situation. This request is denied." Plaintiff had not asked for a release to "all students." Release of this sort of information is covered by law and University policy.

50. Plaintiff was barred from an off-campus art show on April 4-6, 2018, advertised as open to the Champaign-Urbana community, although she had scheduled volunteer

work on location during the event. Plaintiff was told that *attending* would violate no-contact orders, despite their being communication-only. Student staff told Plaintiff was, that the event was open to only current UIUC students. However, was in fact open to the public. The evening of April 4, 2018, Brown informed Plaintiff that attending would not be a "direct violation" of the no-contact orders, but that it might affect readmittance if Christie and Rao complained about her presence, whether or not she communicated with them or not. Plaintiff agreed not to attend.

51. On April 9, 2018, Plaintiff wrote Brown to request mutual NCDs with students Christie, Rao, Seymour, and Stephanie Sroczynski, and to file a complaint about OSCR's failure to act in accordance with federal policy and procedure. These requests were ignored.

52. On May 3, 2018, Plaintiff held readmittance hearing at UIUC and was granted readmittance to UIUC starting May 15, 2018.

53. On May 9, 2018, Plaintiff requested an update from Brown as to making the no-contact orders mutual. On May 11, 2018, Brown replied that "We have already informed the other parties to the existing NCDs that they should not communicate with you. If/when we issue a new one, it will be mutual."

54. On May 25, 2018, Plaintiff received a Letter from Associate Dean of Students Rhonda Kirts explaining that upon Plaintiffs return to campus she would be be barred from the campus LGBT Resource Center and the campus Women's Resource Center except by appointment or for programs not hosted by NCD parties, and under stringent terms. The Letter expressly acknowledges that the NCDs are communication based and not distance based. (they are still in effect.)

55. On May 25, 2018, Plaintiff also received a Disciplinary "Charge Notice" Letter from Wilczynski, reporting that Plaintiff may have violated the student code on May 21, 2018. "It is alleged that you violated a no contact directive when you contacted that student through an on-line dating app." The basis of this alleged violation was that Plaintiff "swiped right" on Christie's dating profile on the lesbian dating app HER, causing the app to send an automated notification that Plaintiff "liked" her. Like many people, Plaintiff "swipes right" on every profile, and sorts matches later.

56. In early June 2018, Plaintiff learned that Sara Colome, Director of Women's Resource, filed an unauthorized FOIA Request, in Plaintiff's name, to the University of Illinois FOIA office regarding complaints that had been filed against Plaintiff. The request was denied.

57. On June 11, 2018, Plaintiff attended meeting with Wilczynski regarding the alleged unauthorized contact with Christie. Plaintiff acknowledged that the notifying account on HER was her own, but stated that it was an automatic notification by the app itself and not an intentional "communication."  Wilczynski unofficially accommodated Plaintiff's prosopagnosia by showing her "screenshots of the complainant's profile to see if you can recognize her with your face blindness." Plaintiff said she did not recognize the picture as Christie because it did not match the description Plaintiff had been using to avoid her. Upon request, Plaintiff then showed Wilczynski that she had blocked Christie on Facebook because Plaintiff feared accidentally tagging Rachel Christie when tagging a Facebook friend also named Rachel. She said she could not be sure that she blocked Christie on HER. Plaintiff did not present the Facebook block as a HER block. Wilczynski stated at the end of the meeting that he believed Plaintiff had

not recognized complainant and that a disciplinary hearing was unlikely, to be determined following an interview with complainant. He specifically asked her to send him a screenshot of the block list on her *Facebook*.

58. Plaintiff continued to ask DRES for accommodations for her Prosopagnosia throughout the period between the meeting and the hearing. After several denials from DRES, Plaintiff requested on July 31, 2018, that the researchers who performed her original tests supply her with a diagnostic letter because her disciplinary case hinged on a diagnosis of prosopagnosia.

59. On August 2, 2018, Dr. Duchaine of Dartmouth College provided a diagnosis letter via email to Plaintiff, which Plaintiff immediately sent to Patricia Malik, Director of DRES.

60. On August 3, 2018, Malik confirmed acceptance of Plaintiff's disability status with Prosopagnosia and directed her to ask Davenport about academic accommodations. Plaintiff replied that she did not need academic accommodations, and was asking for accommodations to the NCDs. Malik responded that accommodations would not be granted for the hearing. Plaintiff responded that she was not asking for accommodations for the hearing. After the hearing, Davenport stated she accommodations for disciplinary hearings were not her job; she directs those requests to Malik, who stated that Plaintiff must make such requests of Davenport.

61. On August 6, 2018, Plaintiff attended disciplinary hearing. Wilczynski now asserted that Plaintiff was lying about all of her defenses, and that Plaintiff had presented the requested *Facebook* list as a block list from *HER*. Asked whether Plaintiff would have been able to recognize her even with face-blindness, Christie responded that Plaintiff

would recognized her due to having multiple images and because Plaintiff had seen

her many times. Christie is not a psychologist or medical professional and did not

conduct any examination of Plaintiff, whether or not she was qualified to make one.

Plaintiff was not permitted to respond.

62. After the hearing, Plaintiff's faculty advisor, Prof. Bruce Rosenstock, spoke with Kim

Soumar, Program Director of OSCR, and learned that undisclosed evidence was

withheld from Plaintiff that swayed the vote toward the negative. Plaintiff was

dismissed from UIUC, held in abeyance until August 13, 2018, or until an appeal

hearing was held.

63. Plaintiff appealed, including a second, supplementary diagnosis letter from Dr.

Duchaine that explained that having a name present is unlikely to trigger recognition

of someone for a person with Prosopagnosia. Her appeal was denied.

64. The illegal discipline imposed on Plaintiff has likely cost her preferred career path,

university teacher and scholar, or anything similarly lucrative, to the future financial

cost of at least $750,000.

65. The conduct listed in the aforementioned paragraphs was pursuant to a policy or

practice of UIUC under color of law, and deprived Plaintiff of rights and privileges

guaranteed under federal or the constitution, or under state law over which this court

has supplemental jurisdiction.

## **LEGAL CLAIMS**

### COUNT I

66. Plaintiff was denied due process under the Fourteenth Amendment

(a) when her housing contract was terminated by Dean Anton on March 27, 2017, without notice or an opportunity to be heard, and,

(b) when Plaintiff was dismissed from UIUC, on Nov. 3, 2017, on the basis of (mis)information acquired by Dean Rony Die about Plaintiff's disciplinary record at MCC, which UIUC had no right to have or to ask for about a particular student, but which Die had nonetheless asked for and received; and

(c) on Aug. 6, 2018, when Plaintiff was dismissed again from UIUC at a meeting presided over by Dean Wilczynski for supposedly "communicating with" with NCD subject Christie by "swiping right" (indicating interest) on her profile on HER, a lesbian dating app, when there was (still) undisclosed evidence presented that Plaintiff was not allowed to learn of or rebut, which Kim Soumar, Director of the Office of Student Conflict resolution informed Plaintiff's Faculty Advisor had swayed the vote.

## COUNT II

67. Plaintiff's First Amendment rights to freedom speech and association were violated

(a) on March 27, 2017, when her housing contract was terminated by UIUC, acting through Anton, because Plaintiff engaged in "sexually explicit conversations," that is, engaged in speech involving statements about having "sexual orientations" as a "kinkster" and a "polyamorist" while in University housing, and asking  University Housing staff  "55 questions over three semesters";

(b) on May 5, 2017, when UIUC, through Dean Mwilambwe, told Plaintiff that kink and polyamory were not to be referred to as "orientations," only "behaviors," and

were not to be openly discussed; and by Anton or Mwilambwe that UIUC "didn't care" about her freedom of speech;

(c) during Summer-Fall 2017, when Sealine told Plaintiff, "Don't have conversations that might make other people uncomfortable"; "Avoid explicit sexual conversations," including self-identification as kinky or poly;

(d) on August 2, 2017, when Sealine wrote Plaintiff that "you should not engage in explicit sexual conversations [understood to include kink or poly, but not trans or homosexuality, because the latter and not the former were protected classes] without their consent" –there is no exception in the First Amendment for talk about classes not protected by federal law;

(e) when, on Oct. 17, 2017, Plaintiff prohibited by Laura Haber, Program Director at Allen from speaking or meeting with a visiting celebrity friend; on Nov. 14, 2017, when Wilczynski barred Plaintiff from attending Queersgiving, an event put on by the LGBT Resource Center, even though the NCD Order did not cover this;

(f) when through the rest of fall 2017, Plaintiff was excluded by University staff and students from other events "because of [her] behavior at Queersgiving," which she did not attend;

(g) when, on Apr. 4-6, 2018, Plaintiff was barred by UIUC student staff from an off-campus art event open to the public because, she was told attendance would violate the NCD, and when Dean Justin Brown told her on Apr. 4, 2018 that it would not be a "direct violation," but could affect her readmission if the subjects of the NCD complained about her;

(h) on May 25, 2018, when Dean Rhonda Kirts wrote Plaintiff to bar her from the campus LGBT and Women's Resource Centers except by appointment or for programs not hosted by the NCD subjects, even though the NCDs were expressly stated to prohibit communication, not proximity; and

(i) on August 6, 2016, when Plaintiff was dismissed from UIUC after a hearing presided over by Wilczynski for supposedly "communicating with" with NCD subject Christie by "swiping right" (indicating interest) on her profile on HER, a lesbian dating app, although she could not recognize Christie from her photograph or first name because of her face-blindness and did not know or reasonably expect that a "swipe right" would cause a message to be sent to Christie.

## COUNT III

68. Plaintiff's rights not to be discriminated against because of her disabilities under § 504, Title II of the ADA, the FHA, and the Student Code 1-104(a) and 1-108 (applying federal disability discrimination claims against UIUC):

(a) were violated when she was evicted from University Housing on 48 hours' notice because of conduct arising from her disabilities and, but for intervention of counsel, left homeless despite her known disabilities, and forced to move her belongings by herself, despite her physical disabilities, to a new dormitory within 72 hours,

(b) and when she was placed in a residence hall across campus without adequate bus access to the whole campus, including halls where she had classes, to a room without necessary accommodations;

(c) on May 5, 2017, when she was told  that she was expected to behave like "any other student" despite her autism, and that DRES could "fix her behaviors";

(d) throughout summer-fall 2017, when Plaintiff was told without clarification, despite request, by Sealine, to "learn to read body language," "adjust your behavior to make other people comfortable";

(e) by imposition of an No-Contact Directive (NCD) on Sept. 1, 2017, with respect to student Rachel Christie (updated  to include student Suda Rao on  Sept. 25, 2017) that required Plaintiff to recognize faces, which her face-blindness prevents her from doing; but UIUC, through Dean Wilczynski, refused to recognize this without a written diagnosis not required by the ADA or other disability discrimination law –such a diagnosis was finally provided; sent to DRES Director Patricia Malik, and officially accepted by Malik on Aug. 3, 2018, and disregarded at the following

(f) on Aug. 6, 2018, when Plaintiff was dismissed again from UIUC after a hearing presided over by Wilczynski for supposedly "communicating with" with NCD subject Christie by "swiping right" (indicating interest) on her profile on HER, a lesbian dating app, although she could not recognize Christie from her photograph or first name because of her face-blindness and did not know or reasonably expect that a "swipe right" would cause a message to be sent to Christie.

COUNT IV

69. Plaintiff's rights to reasonable accommodation of her disabilities under § 504, Title II of the ADA, the FHA, and the Student Code 1-104(a) and 1-108 (applying federal disability discrimination claims against UIUC) were violated:

(a) when she was evicted from University Housing on 48 hours' notice because of conduct arising from her known disabilities, and, but for intervention of counsel, left homeless, and forced her to move her belongings by herself to a new dormitory within 72 hours, take it or leave it, despite her physical disabilities, and

(b) when she was placed in a residence hall across campus without adequate bus access to the whole campus, including halls where she had classes, to a room without necessary accommodations;

(c) on May 5, 2017, when she was told  that she was expected to behave like "any other student" despite her autism, and that DRES could "fix her behaviors";

(d)  throughout summer-fall 2017, when Plaintiff was told without clarification, despite requests, by Sealine, University Housing Director, to learn to "learn to read body language," "adjust your behavior to make other people comfortable";

(e) by imposition of an No-Contact Directive (NCD) on Sept. 1, 2017, with respect to students Rachel Christie (updated on Sept. 25, 2019, to include student Suda Rao), by that required Plaintiff to recognize faces, which her face-blindness prevents her from doing; but UIUC, through Dean Wilczynski, refused to recognize this without a written diagnosis not required by the ADA or other disability discrimination law;

(f) on Sept. 17, 2017, when Plaintiff requested and was refused accommodation by Disability Resources and Educational Services (DRES) for accommodation for face-blindness in regard to the NCDs; and Sealine acknowledged that UIUC was bound by federal disability discrimination law, but would only respect these if approved by DRES, and when Sealine acknowledged that UIUC was bound by

federal disability discrimination law, but would only respect these if approved by DRES;

(g) when on Sept. 25, 2017, Wilczynski failed or refused to send a letter to Christie and Rao to inform them, as a promised accommodation, that "they should remind Plaintiff who they are if Plaintiff approaches them or seems to not recognize them"; which Wilczynski now denies having offered;

(h) when, on Aug, 3, 2018, Plaintiff requested accommodation for a disciplinary hearing with respect to the NCD subjects, and was refused;

(i) On Aug. 6, 2018, when Plaintiff was dismissed from UIUC after a hearing presided over by Wilczynski for supposedly "communicating with" with NCD subject Christie by "swiping right" (indicating interest) on her profile on HER, a lesbian dating app, although she could not recognize Christie from her photograph or first name because of her face-blindness and did not know or reasonably expect that a "swipe right" would cause a message to be sent to Christie, without any regard for requested accommodations.

## COUNT V

70. On Aug. 31, 2017, Defendant Anton, in enforcing University policy about attendance at events in Allen Hall, committed assault against Plaintiff by approached Plaintiff, got within 5 inches of Plaintiff's face, and demanded aggressively, "What are you doing here?," foreseeably putting Plaintiff in reasonable apprehension of a battery by unwanted or provoking contact in being ejected from  Allen Hall, proximately causing fear, anxiety, depression, nightmares, and anguish, and what was informally diagnosed by a UIUC psychiatrist as symptoms of Post-Traumatic Stress Disorder (PTSD).

COUNT VI

71. Defendants subjected Plaintiff to Intentional Infliction of Emotional Distress under Illinois law by the entire course of conduct described above, including dismissing her from UIUC *twice* because of their own violations of her rights to due process, freedom of speech, and disability discrimination law, which conduct was extreme and outrageous, going beyond all bounds of decency, such that reasonable people, on hearing the facts, would be compelled to feelings of resentment and outrage; and disregarded the high probability that it would cause extreme emotional distress, which it did, including anguish, anxiety, depression, symptoms of PTSD, resentment, and outrage.

COUNT VII

72. Plaintiff's state contract rights were violated by disability discrimination, failure to reasonably accommodate, and other federal violations detailed above; by the University Housing's failure to honor her twelve month lease contract for 2017-18, and by refusing to refund her payment for University Housing she had not been allowed to use.

**RELIEF REQUESTED**

73. $10 million in compensatory damages for violations of rights.

74. $750,000 (USD 2011) in lost future earnings, based on damage to reputation

75. $73,523.93 direct monetary losses for full reimbursement for Plaintiff's tuition (including those paid by loans) and expenses at UICU.

76. $10 million in noneconomic damages, anguish, emotional distress.

77. $10 million in punitive damages.

78. Vacating disciplinary determinations and expungement or sealing of all related or relevant disciplinary records.

79. Vacating or rescinding any and  all NCDs against Plaintiff.

80. Having Plaintiff's student status changed to "In Good Standing" and "Eligible for Enrollment."

81. Having UIUC issue a public apology issued via the campus mass-mailing system to students enrolled during the relevant years + one, 2017-19, regarding issuance of and upholding NCDs based on biases and disability discrimination against Plaintiff,  and unfair dismissal based on violations of these; Plaintiff to be named in the apology as Jane Doe. Alternatively, Plaintiff shall be given the right to publish her story via local news agencies without consequence or discipline or further discrimination.

82. UCIC will require annual sensitivity training  for five years for all University Housing employees, staff, and administration with respect to disability discrimination, sexual orientation, and constitutional rights.

83. Attorney's fees as costs under 42 U.S.C. § 1988.

84.  Any other relief the Court believes is just or necessary.

Respectfully,

| March 27, 2019 | /s/**Justin Schwartz** |
|---|---|
| | Justin Schwartz |
| | ARDC No. 6257328 |
| | 1723 W. Devon Ave. #607882 |
| | 847-687-5477 (ph.) |
| | 847-261-0187 (fax) |
| | justinschwartzlaw@gmail.com |