### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| **JANE DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 19-CV-1107** |
| | ) | |
| **BOARD OF TRUSTEES OF THE** | ) | |
| **UNIVERSITY OF ILLINOIS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### ORDER

Plaintiff, Jane Doe, filed an Amended Complaint (#21) on October 31, 2019, against Defendants, Board of Trustees of the University of Illinois ("the Board"), et al., alleging: violations of her rights under the U.S. Constitution, failure to accommodate her disabilities in violation of § 504 of the Rehabilitation Act (29 U.S.C. § 794), Title II of the Americans with Disabilities Act ("ADA") (42 U.S.C. § 12132, et seq.), and Fair Housing Act ("FHA") (42 U.S.C. §§ 3603 and 3604), as well as multiple state law claims.

Defendants filed an Amended Motion to Dismiss (#28) on December 9, 2019, to which Plaintiff filed a Response (#43) on July 26, 2020.

Defendants filed their Reply (#46) on September 1, 2020.  This motion is now fully briefed and ready for ruling.

### BACKGROUND

The following background is taken from the allegations in Plaintiff's Amended Complaint.  At this stage of the proceedings, the court must accept as true all material

allegations of the Amended Complaint, drawing all reasonable inferences therefrom in Plaintiff's favor.  See *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016).

*Factual Allegations*

Plaintiff was a student at the University of Illinois at Urbana-Champaign ("the University"), a state institution of higher learning that receives federal funds, from August 2015 through December 2017.  Plaintiff identifies her sexual orientation as kinkster, polyamorous, and lesbian.  At all relevant times, Plaintiff was the president of the official University student club or organization for kinkster/poly sexualities (Students for Alternative Sexualities, Safety, Support and Consent) ("SASSC").  The SASSC was officially affiliated with the University LGBT (Lesbian, Gay, Bisexual, Transgender) Center.  Plaintiff has been diagnosed with autism spectrum disorder (Asperger's), resulting in an inability to understand non-verbal communication, and adult degenerative scoliosis, which is an extreme curvature of the spine, which results in pain and mobility issues.  Plaintiff has also been diagnosed with prosopagnosia, an inability to recognize faces, names, and often voices.

The University Student Code, section 1-104(a), grants students in University Housing the same protections and rights as any other U.S. citizen.  Plaintiff alleges that the Code is a contract between students and the University, and that the University is therefore obligated to uphold all federal discrimination laws including the FHA, ADA, Rehabilitation Act, Title II, Title VII, and Title IX.

2

Plaintiff alleges that the University and its employees are obligated to practice and uphold non-discrimination based on disability status, race, sex, sexual orientation, age, and other personal identity factors.

<u>Initial Incident With Students A and B and No-Contact Directive</u>

In early March 2017, Student A, the student Multicultural Advisor at Allen Hall (a residential dormitory on campus), and Student B, a student Resident Advisor at Allen Hall, both University employees, reported Plaintiff for "sharing or [publicly] using an electrotherapy massager [or] TENS unit"…"consensually" and they "inferred that it was a sex toy" because of Plaintiff's claimed orientations.  It was not.

 On March 8, 2017, Plaintiff met with Sam Holden, Resident Director of Allen Hall, to discuss concerns that Plaintiff was "sharing a sex toy" with residents or using it publicly.  Plaintiff informed Holden that the device in question was a handheld TENS unit.  Holden then sent a letter to Plaintiff "in which this point was stricken from the list of complaints against her."

On March 22, 2017, Defendant Patricia Anton, Associate Director of University Housing, requested an emergency meeting with Plaintiff for March 27, 2017, without telling Plaintiff what the meeting was about.  At the meeting, Anton handed Plaintiff a letter stating her housing contract was being cancelled due to "engaging in sexually explicit conversations" and putting "intense drain" on housing staff.  Plaintiff was not given notice, nor was she given an opportunity to move or be moved to a different residence.  Anton clarified in person that "engaging in sexually explicit conversation" amounted to Plaintiff publicly identifying herself as a "kinkster" and a "polyamorist," without going into any lurid details.  Anton instructed Plaintiff that she was not

permitted to claim these as "orientations" because they are "behaviors" and she was not to talk about them publicly.

Putting an "immense drain" (the discrepancy between "intense" and "immense" is present in Plaintiff's Amended Complaint) on staff was clarified as asking the residence director "55 questions over three semesters."  Anton refused to put these clarifications in writing or to put further explanation in writing.  Anton claimed that by asking about being in trouble and needing a new home, Plaintiff admitted that she "knew what she did was wrong."  Plaintiff alleges that she did not admit to any such thing, that she denied it then, and that she denies it now.

<u>Plaintiff's Eviction from Allen Hall and New Dormitory Accommodations</u>

Plaintiff received an "Eviction Letter" on March 27, 2017, which gave Plaintiff until 5:00 pm on March 29, 2017, to move out of her residence hall.  This was only two days, yet Plaintiff alleges that the law requires three days notice.  The Eviction Letter was sent to University police. The Eviction Letter included a 100-foot No Trespassing order for all University housing, including dining halls.  The letter stated that if Plaintiff violated this order, she would be arrested.

On the same day she received the Eviction Letter, Plaintiff's attorney contacted University Counsel Loren Israel and said the University was "kicking out a highly at-risk individual, someone who is transgender, disabled, and otherwise homeless, with almost no due process, subjecting her to a potential death sentence."  Israel responded that this was "known and intentional."

4

On March 28, 2017, Plaintiff timely submitted an appeal drafted by her attorney as instructed by the Eviction Letter.  Her attorney also submitted a proposed settlement.  Plaintiff's appeal was granted and she was given three days to move to a new residence hall across campus.  After she expressed interest in three residence halls that would be more beneficial to her health on campus, in their access to buses, the health center, and a late-night dining hall, Plaintiff was orally informed during a meeting with Associate Housing Director Jim Rooney that the decision was based on disability status and her age.  Plaintiff was not allowed the interactive process granted under § 504 and the ADA.  He stated "I will not have a discussion with you, I am giving you your options and you can pick one."

As part of this meeting with Rooney, Plaintiff requested that the 100-foot No Trespass order be reduced to 50 feet so that she could continue her involvement with the Red Oak Rain Garden ("RORG") restoration project.  This was granted.  Plaintiff is still involved with the project, and alleges that the project is educational.

Plaintiff's attorney emailed Israel on March 30, 2017, that the University must abide by the ADA and due process.  Israel emailed back the next day denying the University's knowledge of Plaintiff's prior disabilities.  Plaintiff alleges this denial was false.  Israel also stated that the placement was "accessible to all of campus by multiple buses at that location."  Plaintiff alleges there is only one adjacent bus route that only accesses the north side of campus.

5

Israel also stated that the room which Plaintiff was placed in, Daniels 154, was an ADA room that granted the requested accommodations.  It was not.  Plaintiff contacted her attorney about this.  University counsel denied Plaintiff's claims about the room, until photographic evidence was provided.  Housing then apologized for the mistake and moved Plaintiff to the room next door, Daniels 150.

Summer 2017 Discussions on Plaintiff's Behavior

On May 5, 2017, Plaintiff met with Anton and Defendant Dean Lowa Mwilambwe, Assistant Vice Chancellor for Student Affairs, to discuss disability discrimination and restriction of freedom of speech, as well as repeated exclusion from events. Mwilambwe stated that Plaintiff would otherwise be expected to behave like any other student, even though she was autistic, and that University Disability Resources and Educational Services ("DRES") could "fix your behaviors."  Mwilambwe reasserted that kink and polyamory were not to be referred to as "orientations," only "behaviors," and were not to be openly discussed.  In response to Plaintiff's statement that she was protected by freedom of speech, either Anton or Mwilambwe stated that they "didn't care."

On June 9, 2017, Plaintiff accepted two one-year term contracts, of twelve months each, to continue living in Daniels 150 starting in Fall 2017.  Defendant University Housing Director Alma Sealine promised Plaintiff in writing that she would be allowed to attend events at Allen Hall.  During Summer and Fall 2017, Plaintiff sought clarifications from Sealine about overbroad, vague, and inconsistent guidelines regarding expected behaviors, e.g. "Don't have conversations that might make other people uncomfortable[;]" "avoid explicit sexual conversations," including self-

6

identification as kinky or poly, but identification as gay or trans was okay.  Otherwise,
Sealine refused to discuss clarifications, repeatedly telling Plaintiff to "read body
language," "adjust your behavior to make other people feel comfortable," and "get
consent to talk or flirt with people."

On August 4, 2017, Sealine wrote Plaintiff that she did "not wish to limit your
freedom to discuss sexual matters," but "you should not engage in explicit sexual
conversations [understood to include kink or poly, but not trans or homosexuality,
because the latter and not the former were protected classes] without their consent."
Sealine also allowed Plaintiff to attend Allen Hall events with an escort but restricted
her from all other Allen Hall locations and times.  This letter was not sent to University
police.

On August 23, 2017, Dr. Brin Schuler of the McKinley Campus Health Center,
added Plaintiff's TENS unit to her school medical record as a medical device and not a
sex toy.

Allen Hall Encounter With Defendant Anton

On August 31, 2017, Plaintiff attended a program at Allen Hall with a friend and
escort.  Shortly into the program, Anton was called to Allen Hall.  Anton approached
Plaintiff, got within five inches of Plaintiff's face, and demanded aggressively "what
are you doing here?"  When Plaintiff explained she was there with Sealine's
permission, Anton said "fine, but leave as soon as it's over."  Plaintiff complained to
Sealine the next day, but Sealine responded that staff have a right to question any
person in a building.  Plaintiff replied that Anton's aggressive behavior was in direct
violation of three sections of the Student Code, that Anton came from across campus

and was not employed or responsible for overseeing Allen Hall.

Since that encounter, and others, with Anton, Plaintiff has been suffering from what a University psychiatrist subsequently diagnosed as post-traumatic stress disorder ("PTSD").  The psychiatrist refused to write this diagnosis down and place it in Plaintiff's record "since you could use it against the University."

On November 15, 2017, Plaintiff sought a No Contact Directive ("NCD") against Anton out of fear and for causing Plaintiff PTSD.  The Office of Student Conflict Resolution ("OSCR") claimed it could not offer an NCD between a student and staff member.  Plaintiff alleges such orders are issued all the time.

<u>Second NCD for Students A and B Issued</u>

At the end of August 2017, Plaintiff started a class where Students A and B were also enrolled.  Plaintiff did not interact with either student during the course, and specifically asked the professor to be assigned a different teaching assistant ("TA") than Student A due to reasons unrelated to the Amended Complaint.

On September 1, 2017, Defendant University Housing Director and Dean of Students Robert Wilczynski issued Plaintiff a NCD regarding verbal communication for Student A, thus revealing to Plaintiff that Student A was one of the complainants in the initial complaint about the TENS unit.  Plaintiff had not spoken with or otherwise contacted Student A since planning a meeting on November 10, 2016.  Wilczynski also imposed a 50-foot No Trespass order from Allen Hall.  Because this NCD required Plaintiff to recognize a person, on September 3, 2017, Plaintiff informed Wilczynski that she has prosopagnosia or "face-blindness," a disability which limits her ability to recognize people, and asked for accommodation.  This and her other disabilities were

on record and accommodated for previously by both Allen Hall Resident Director Holden during Plaintiff's Allen Hall residency and Anton during a class taught by her. Wilczynski demanded a written diagnosis and refused to engage in discussion about accommodation.

On September 7, 2017, Sealine sent Plaintiff an updated letter ("the September Letter") granting Plaintiff permission to use or share the TENS unit, to "flirt with consenting peers," to identify kink and/or polyamory as orientations, and to discuss sexual topics with peers "if they are already discussing sexual topics and consent to your joining."

On September 17, 2017, Plaintiff requested DRES issue an accommodation for prosopagnosia in regard to the NCDs.  DRES refused.  Sealine acknowledged her office was bound by the FHA and ADA, but refused to uphold Plaintiff's disability rights under these statutes without DRES' approval.

 On September 25, 2017, Wilczynski updated the NCD to include Student B. Plaintiff's last contact with Student B was during the previous week to ask to speak to whoever was in charge of the Allen Hall LGBT club. Prior to that, she had no contact with Student B since early March 2017, when Students A and B complained about the TENS unit.  Plaintiff arranged an emergency meeting with Wilczynski.  During that meeting, Wilczynski said he was closing the investigation in regard to Plaintiff's behavior, stating that "even if the complaints were substantiated, they would not be violations of the Student Code."  During the meeting, Plaintiff discussed her prosopagnosia, and Wilczynski said that Students A and B "would be informed they should remind Plaintiff who they are if Plaintiff approaches them or seems to not

recognize them."  The letter was never sent, and Wilczynski denies making that promise.  Wilczynski sent a follow-up disciplinary letter ending the investigation but leaving the NCD and No Trespass order in place due to "significant conflict" between Plaintiff and complainants.

      Plaintiff's Alleged Failure to Report Disciplinary Actions at Prior Institution and <u>First Dismissal from the University</u>

On or before September 13, 2017, University counsel Israel learned of a lawsuit involving student discipline to which Plaintiff was subjected at McHenry County College ("MCC"), her prior educational institution.  Israel reported these revelations to Associate Dean of Students Justin Brown, who reported them to Assistant Dean of Students Rony Die.

On October 3, 2017, Dean Die wrote Plaintiff accusing her of lying about discipline at MCC on her University entry application in 2014 and not updating it before the first day of classes in 2015.  Several of the incidents in question were expunged, and were not in Plaintiff's record from MCC.  Plaintiff had not received official notice of any final determination by MCC by the first day of classes at the University.

On October 11, 2017, Plaintiff viewed her University disciplinary files.  The only complaints there involved her interaction with peers based on their age, the consensual sharing or personal use of her TENS unit at two programs, her discussing her kink orientation, and her lack of understanding of body language due to autism, none of which were unlawful.

On October 17, 2017, Plaintiff had planned to meet up with a celebrity friend visiting the campus for "programming."  After arranging in-person to meet at a local coffee shop, the friend messaged Plaintiff by text that Laura Haber, Allen Hall's Program Director, had told the friend not to meet or communicate with Plaintiff.

On October 20, 2017, Plaintiff met with Dean Die to discuss the allegations about failure to disclose prior discipline at MCC.  Die requested permission to contact MCC and ask about Plaintiff.  Plaintiff refused.  Die informed Plaintiff that he would still call but would only ask general questions and not name Plaintiff.  In fact, it is clear Die asked questions about Plaintiff by name and received specific answers about her.  Some time later, Die called MCC again and asked the MCC representative if records could be expunged.  The MCC representative answered "No, I am unaware of any expungements."

On November 3, 2017, Plaintiff attended a hearing regarding dismissal from the University because of non-disclosure of previous discipline.  Plaintiff disputed this, on the ground, among others, that the University's Student Code required an official notice that MCC had not provided until after the time required for disclosure, but Plaintiff was dismissed from the University of Illinois for this in part because she had received an early unofficial email about the dismissal and so was on notice.  The

11

dismissal from the University of Illinois was upheld after appeal, but held in abeyance until December 22, 2017, the end of the semester, after which Plaintiff would no longer be permitted on any University property until readmitted.

Housing Refund Issue

In late October 2017, Plaintiff petitioned for a medical release from her housing contract due to anxiety, depression, and other psychological reasons.  During subsequent discussions with Housing Director Sealine about this, Plaintiff stated that she had been charged for a full year, including the upcoming Summer.  Sealine stated that Plaintiff had not been charged for Summer.  After some back and forth, Plaintiff suggested settling the dispute in county court.  Sealine then admitted to the "mistaken overcharge."  The University claimed the amount in question was $282, when in fact it was $2,014.79, which was only refunded after further dispute.  Plaintiff also asked Sealine about a housing refund if dismissed.  Sealine said there would be no refund if Plaintiff were dismissed for "judicial reasons," suggesting that the hearing at the University was "judicial."  The hearing was administrative, not judicial.

Queersgiving Incident and Plaintiff's Attorney's Involvement Over Alleged Bullying and Harassment

On November 14, 2017, Plaintiff was invited to an LGBT event, called "Queersgiving," but the director of the LGBT Resource Center suggested that Plaintiff could not attend due to the NCD because the hosts were Students A and B.  Plaintiff stated that the NCD was not a keep-away order but only verbal, and she did not intend to speak with them.  Wilczynski confirmed to the director that the NCD was verbal only.  The director suggested Plaintiff have Students A and B notified.  Plaintiff did

12

this, but moments after she was scheduled to arrive, Wilczynski sent Plaintiff an email barring her from the event, as "it was not academic."  The NCD did not state that there was a keep-away order for non-academic events.  Plaintiff left without entering the venue.

Over the rest of the Fall of 2017, Plaintiff was repeatedly instructed by University staff and registered student organization ("RSO") leadership to leave events "due to your behavior at Queersgiving," which she did not attend.

On November 19, 2017, Plaintiff's attorney sent University counsel and named students and staff, including Student A, a formal cease and desist letter regarding defamation of Plaintiff and Plaintiff's barring from events on and off campus, as well as violations of Plaintiff's freedom of association with various third parties.  Israel responded that housing staff would be updated about the freedom of association claim.

In December 2017, Plaintiff informally requested that Dean Brown sign a Family Educational Rights and Privacy Act ("FERPA") Release of Information to students regarding the September 25, 2017, finding that she had not violated the Student Code. Brown refused to allow Plaintiff to release any information to students or even fill out a release form.  Plaintiff told Brown about ongoing bullying and defamation and that OSCR "did not care and would not do anything about students defaming another student, past or former."

Plaintiff asked to report the bullying and harassment to the University Behavioral Assessment and Response Team ("BART"), deputized to deal with bullying and harassment among students, of which Brown, Wilczynski, and Israel were core members.  She was denied permission to report the problems to BART.

As of December 22, 2017, Plaintiff was not in school but living off-campus in Carbondale, Illinois.  The bullying, harassment, and defamation continued during visits to Champaign, but not on campus, because Plaintiff was barred from going there. On January 13, 2018, Plaintiff's attorney sent Students A and B, and now a Student C, formal cease and desist letters against further bullying and defamation during the Spring semester.

<u>Denial of Release to Students</u>

On February 13, 2018, Plaintiff wrote to Brown to be permitted to release to Students A and B and other staff at Allen Hall Wilczynski's finding that she had not violated the Student Code and Sealine's affirmation of her free speech rights.  On February 15, 2018, Brown replied "you asked to sign a release for all students, which we will not do.  And even if you signed a release for Allen Hall staff, I would not share the information (a release does not compel sharing).  And the section you cite does not apply in this situation.  This request is denied."  Plaintiff had not asked for a release to "all students."  Release of this sort of information is covered by law and University policy.

14

Off-Campus Art Show Incident

Plaintiff was barred from an off-campus art show on April 4-6, 2018, advertised as open to the Champaign-Urbana community, although she had scheduled volunteer work on location during the event. Plaintiff was told that attending the event would violate the NCDs, despite the NCDs being communication-only. Student staff told Plaintiff that the event was open only to current University students, but, in fact, the event was open to the public. The evening of April 4, 2018, Brown informed Plaintiff that attending would not be a "direct violation" of the NCDs, but that it might affect readmittance if Students A and B complained about her presence, whether she communicated with them or not. Plaintiff agreed not to attend.

On April 9, 2018, Plaintiff wrote to Brown to request mutual NCDs with Students A, B, C, and now D, and to file a complaint about OSCR's failure to act in accordance with federal policy and procedure. These requests were ignored.

On May 3, 2018, Plaintiff attended a readmittance hearing at the University, and was granted readmittance starting May 15, 2018.

On May 9, 2018, Plaintiff requested an update from Brown about making the NCDs mutual. On May 11, 2018, Brown responded that "we have already informed the other parties to the existing NCDs that they should not communicate with you. If/when we issue a new one, it will be mutual."

15

HER App Incident With Student A

On May 25, 2018, Plaintiff received a letter from Associate Dean of Students Rhonda Kirts explaining that upon Plaintiff's return to campus she would be barred from the campus LGBT Resource Center and the campus Women's Resource Center except by appointment or for programs not hosted by NCD parties, and under stringent terms. The letter expressly acknowledged that the NCDs were communications-based and not distance-based.

On May 25, 2018, Plaintiff also received a disciplinary "charge notice" letter from Wilczynski, reporting that Plaintiff may have violated the Student Code on May 21, 2018. "It is alleged that you violated a no contact directive when you contacted the student through an on-line dating app." The basis of this alleged violation was that Plaintiff "swiped right" on Student A's dating profile on the lesbian dating app HER, causing the app to send an automated notification that Plaintiff "liked" Student A. Plaintiff "swipes right" on every profile, and sorts matches later.

In early June 2018, Plaintiff learned that Sara Colome, Director of Women's Resources, filed an unauthorized Freedom of Information Act ("FOIA") request, in Plaintiff's name, to the University FOIA office regarding complaints that had been filed against Plaintiff. The request was denied.

On June 11, 2018, Plaintiff attended a meeting with Wilczynski regarding the alleged unauthorized contact with Student A. Plaintiff acknowledged that the notifying account on HER was her own, but stated that it was automatic notification by the app itself and not an intentional "communication." Wilczynski unofficially accommodated Plaintiff's prosopagnosia by showing her "screenshots of the

16

complainant's profile to see if you can recognize her with your face blindness." Plaintiff said she did not recognize the picture as Student A because it did not match the description Plaintiff had been using to avoid her.  Upon request, Plaintiff then showed Wilczynski that she had blocked Student A on Facebook because Plaintiff feared accidentally tagging Student A when tagging a Facebook friend with the same first name as Student A.  She said she could not be sure that she blocked Student A on HER.  Plaintiff did not present the Facebook block as a HER block.  Wilczynski stated at the end of the meeting that he believed Plaintiff had not recognized the complainant and that a disciplinary hearing was unlikely, to be determined following an interview with the complainant.  He specifically asked her to send him a screenshot of the block list on her Facebook.

Accommodations from DRES for Prosopagnosia

Plaintiff continued to ask DRES for accommodations for her prosopagnosia throughout the period before Plaintiff's August 6, 2018, disciplinary hearing.  After several denials from DRES, Plaintiff, on July 31, 2018, requested that the researchers who performed her original tests supply her with a diagnostic letter because her disciplinary case hinged on a diagnosis of prosopagnosia.  On August 2, 2018, Dr. Duchaine of Dartmouth College provided a diagnosis letter via email to Plaintiff, which Plaintiff immediately sent to Patricia Malik, Director of DRES.

On August 3, 2018, Malik confirmed acceptance of Plaintiff's disability status with prosopagnosia and directed her to ask DRES Access Specialist Teresa Davenport about academic accommodations.  Plaintiff replied that she did not need academic accommodations, and was asking for accommodations to the NCDs.  Malik responded

17

that accommodations would not be granted for the hearing.  Plaintiff responded that she was not asking for accommodations for the hearing.  After the hearing Davenport stated accommodations for disciplinary hearings were not her job; she directs those requests to Malik, who stated Plaintiff was to make such requests of Davenport.

<u>August 6, 2018, Disciplinary Hearing and Second Dismissal from the University</u>

On August 6, 2018, Plaintiff attended the disciplinary hearing.  Wilczynski now asserted that Plaintiff was lying about all of her defenses, and that Plaintiff had presented the requested Facebook list as a block list from HER.  Asked whether Plaintiff would have been able to recognize her even with face blindness, Student A responded that Plaintiff would recognize her due to having multiple images and because Plaintiff had seen her many times.  Student A is not a psychologist or medical professional and did not conduct any examination of Plaintiff, whether or not she was qualified to make one.  Plaintiff was not permitted to respond.

After the hearing, Plaintiff's faculty advisor, Prof. Bruce Rosenstock, spoke with Kim Soumar, Program Director of OSCR, and learned that undisclosed evidence was withheld from Plaintiff that swayed the vote towards the negative.  Plaintiff was dismissed from the University, held in abeyance until August 13, 2018, or until an appeal hearing was held.

Plaintiff appealed, including a second, supplementary diagnosis letter from Dr. Duchaine that explained that having a name present is unlikely to trigger recognition of someone for a person with prosopagnosia.  Her appeal was denied.

On September 19, 2018, after the appeal hearing and decision, Plaintiff was informed by Dean Debra Ann Imel that due to University policy, audio recordings

18

made and used during the hearing processes would be destroyed by midnight and to appeal their destruction to Dean Brown.  Plaintiff did so, but never received a reply. Plaintiff notes she was never informed about this policy from prior hearings.  The University had been and is still under a litigation hold for all matters relating to Plaintiff since the Eviction Letter of March 27, 2017.

On June 10, 2019, University Technology Services informed Plaintiff that they would be revoking her access and "expiring" her student email alias, online file storage, and "much more."  The next day, Plaintiff replied that she had a litigation hold on her personal records and required access to the account for such purposes as court-ordered discovery and other reasons, including her expressed intent to apply for readmission.  Plaintiff's attorney was cc'd on the email.  Plaintiff's preservation request was denied and her account was terminated on June 14, 2019, destroying much crucial evidence.

Plaintiff maintains that "she has shown express intent on continuing to be associated" with the University by informing a University official of her intention and wish to apply to the Graduate School, her involvement with the University's Red Oak Rain Garden ("RORG") restoration project, and as a returning resident to the Champaign-Urbana area.

The discipline imposed on Plaintiff "may have cost her preferred career path," such as college teacher or scholar, to the future financial cost of $750,000.

*Plaintiff's Claims*

It should be noted, before going through the counts in Plaintiff's Amended

Complaint, that it is not entirely clear which counts are against the Board, the

individual Defendants in their official capacities, and the individual Defendants in

their individual capacities.

Plaintiff, in Count I, claims that she was denied due process under the U.S.

Constitution's Fourteenth Amendment when: (a) Dean Anton terminated her housing

contract on March 27, 2017, without opportunity to be heard; (b) she was dismissed

from the University on November 3, 2017, on the basis of erroneous information

acquired by Dean Die from MCC, which Die had no right to obtain; (c) she was again

dismissed from the University on August 6, 2018, at a meeting presided over by Dean

Wilczynski for supposedly communicating with Student A, when there was

undisclosed evidence presented that Plaintiff was not allowed to learn of or rebut.

OSCR Director Kim Soumar informed Plaintiff's faculty advisor, Prof. Rosenstock, that

this undisclosed information had swayed the vote against Plaintiff.

In Count II, Plaintiff alleges her First Amendment rights to freedom of speech

and association were violated when: (a) the University, through Anton, terminated her

housing contract on March 27, 2017, for engaging in "sexually explicit conversations"

by discussing her sexual orientation as a kinkster and polyamorist and for asking

University housing 55 questions over three semesters; (b) the University, through Dean

Mwilambwe, on May 5, 2017, told Plaintiff that kink and polyamory were not to be

referred to as "orientations," only "behaviors" and were not to be openly discussed,

and when told by Anton or Mwilambwe that the University "didn't care" about her

freedom of speech; (c) Sealine told Plaintiff, in the Summer and Fall of 2017, to not have conversations that made people uncomfortable and to avoid explicit sexual conversations, including conversations where she self-identified as kinky or poly; (d) Sealine wrote Plaintiff on August 2, 2017, to not engage in sexually explicit conversations without the consent of others when poly and kinky are not protected classes, unlike trans or homosexuality; (e) Plaintiff's friend was prohibited by Laura Haber from speaking or meeting with Plaintiff on October 17, 2017, and when Wilczynski barred Plaintiff from attending Queersgiving on November 14, 2017, even though the NCD did not cover that; (f) Plaintiff was excluded by University staff and students through the Fall of 2017 from events because of her behavior at Queersgiving, which she did not attend; (g) when Plaintiff was barred by University student staff on April 4-6, 2018, from an off-campus art event when it was open to the public, and when on April 4, 2018, Dean Brown told her that it would not be a "direct violation" of the NCD but could affect her readmission if the NCD subjects complained about her; and (h) Dean Kirts wrote Plaintiff on May 25, 2018, to bar her from the campus LGBT and Women's Resource Centers except by appointment or for programs not hosted by the NCD subjects, even though the NCDs were expressly stated to prohibit communication, not proximity.

In Count III, Plaintiff alleges her rights not to be discriminated against because of her disabilities under § 504, Title II of the ADA, the FHA, and Student Code Sections 1-104(a) and 1-108, were violated when: (a) she was evicted from University housing on 48 hours' notice because of conduct arising from her disabilities and, but for the intervention of counsel, left homeless despite her known disabilities, and forced to

move her belongings by herself to a dorm within 72 hours; (b) she was placed in a residence hall across campus without adequate bus access to the whole campus, to a room without necessary accommodations; (c) on May 5, 2017, she was told that she was expected to behave like "any other student" despite her autism, and that DRES "could fix her behaviors[;]" (d) throughout the Summer and Fall of 2017 she was told without clarification, despite request, by Sealine to "learn to read body language," and "adjust your behavior to make other people comfortable[;]" (e) the September 2017 NCDs with Students A and B required her to recognize faces, which her prosopagnosia prevented her from doing, but the University, through Dean Wilczynski, refused to recognize this without a written diagnosis not required by the ADA - such a diagnosis was finally provided, sent to DRES Director Malik, and officially accepted by Malik on August 3, 2018, and disregarded at the following hearing; and (f) Plaintiff was again dismissed from the University at a hearing on August 6, 2018, for her behavior towards Student A on the HER app, when her disability prevented her from recognizing Student A via her photograph and she did not reasonably know "swipe-right" would cause a message to be sent to Student A.

In Count IV, Plaintiff alleges her rights to reasonable accommodation of her disabilities under § 504, Title II of the ADA, the FHA, and Student Code Sections 1-104(a) and 1-108, were violated when: (sub-allegations (a)-(e) and (i) essentially repeat the allegations from Count III); (f) she requested and was refused accommodation on September 17, 2017, by DRES for her prosopagnosia in regard to the NCDs, and Sealine acknowledged that the University was bound by federal disability discrimination law, but would only respect it if approved by DRES; (g) when Wilczynski failed or refused

to send a letter on September 25, 2017, to Students A and B to inform them, as a

promised accommodation, that "they should remind Plaintiff who they are if Plaintiff

approaches them or seems to not recognize them[;]" and (h) when Plaintiff was refused

a requested accommodation for a disciplinary hearing with respect to the NCD subjects

on August 3, 2018.

In Count V, Plaintiff alleges a state tort of assault against Defendant Anton for

the incident on August 31, 2017, at Allen Hall, when Anton approached within five

inches of Plaintiff's face and aggressively demanded "what are you doing here?",

placing Plaintiff in reasonable apprehension of a battery by unwanted or provoking

contact in being ejected from Allen Hall, causing fear and PTSD and anxiety.

In Count VI, Plaintiff alleges against all Defendants that the entire course of

conduct described in the Amended Complaint gives rise to a state tort of intentional

infliction of emotional distress.

In Count VII, Plaintiff alleges her state contract rights were violated by disability

discrimination, failure to reasonably accommodate, and other federal violations

detailed above by: (a) the University's failure to honor her two consecutive twelve

month lease contracts for 2017-18; (b) for refusing to refund her payment for housing

she had not been allowed to use, for overcharging her for housing and refusing to

refund the proper amount until after repeated grievances; (c) for the original Allen Hall

eviction based on biases and disability discrimination under which the FHA and U.S.

Department of Housing and Urban Development ("HUD") acts, as well as § 504 of the

Rehabilitation Act, and Illinois and Urbana tenant rights project, without engaging in

the interactive process; and (d) for first opting to evict rather than relocate Plaintiff as

part of a Title IX investigation as procedure mandates.

Plaintiff seeks millions of dollars in damages, as well as various forms of injunctive relief.

ANALYSIS

Defendants have moved to dismiss all counts of Plaintiff's Amended Complaint under various sections of Rule 12 of the Federal Rules of Civil Procedure.  Defendants also move to strike portions of the Amended Complaint under Rule 12(f).  Plaintiff, in her Response, argues that Defendants' motion misstates facts and allegations of the Amended Complaint, and fails to establish grounds to dismiss any count.  Plaintiff urges the court to deny the Amended Motion to Dismiss in its entirety.

*Rule 12(b) Standards*

Defendants bring their dismissal motion under both Rules 12(b)(1) and 12(b)(6). "When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), the court should ordinarily decide the 12(b)(1) motion first because dismissal under this rule makes other challenges moot."  *Sims v. Senior Income Reverse Mortgage Corp.*, 2002 WL 424351, at *1 (N.D. Ill. Mar. 18, 2002).

Rule 12(b)(1) motions may be brought when there is a lack of subject matter jurisdiction.  Fed.R.Civ.P. 12(b)(1).  In considering whether to dismiss for lack of subject matter jurisdiction, the district court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff.  *Evers v. Astrue*, 536 F.3d 651, 656 (7th Cir. 2008).  However, the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.  *Evers*, 536 F.3d at 656-57.  "When subject-matter jurisdiction—which is to say, the power to hear and decide the case at all—is at stake, a district judge may resolve factual disputes and make any findings necessary to determine the court's adjudicatory competence."  *Craftwood II, Inc. v. Generac Power Systems, Inc.*, 920 F.3d 479, 481 (7th Cir. 2019).

If the court has jurisdiction, however, then it must take all plausible allegations in favor of the complainant when handling a motion to dismiss under Rule 12(b)(6).  *Craftwood II*, 920 F.3d at 481.  The court must accept all well-pleaded facts as true, and draw reasonable inferences in plaintiff's favor.  *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013).

A claim satisfies Rule 8(a)(2)—and avoids dismissal under Rule 12(b)(6)—if the complaint alleges facts that show the claim is "plausible on its face."  *Taha v. International Brotherhood of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020), quoting *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007).  "'A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Taha*, 947 F.3d at 469, quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When a complaint's facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "shown"—that the pleader is entitled to relief, meaning that a complaint must plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Taha*, 947 F.3d at 469, citing *Iqbal*, 556 U.S. at 678.  "Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'"  *Taha*, 947 F.3d at 469, quoting *Iqbal*, 556 U.S. at 678.  "In keeping with these principles, when considering the viability of a claim in the face of a Rule 12(b)(6) challenge, [the court] may reject sheer speculation, bald assertions, and unsupported conclusory statements."  *Taha*, 947 F.3d at 469.

*Dismissal Under Rule 12(b)(1)*

<u>Count I: Due Process</u>

The court first considers Defendants' Rule 12(b)(1) arguments with regard to Count I, Plaintiff's due process claims.  First, the motion is granted with respect to Defendant Board of Trustees.  The Eleventh Amendment to the Constitution bars the claims against the Board itself, and § 1983 does not authorize such claims.  See *Carmody v. Board of Trustees of the University of Illinois*, 893 F.3d 393, 403 (7th Cir. 2018).  The Eleventh Amendment bars most claims in federal court against a state that does not consent to the suit.  *Carmody*, 893 F.3d at 403.  "This constitutional immunity extends to the Board of Trustees of the University of Illinois."  *Carmody*, 893 F.3d at 403.  In any

event, "[a]part from the Eleventh Amendment, the Supreme Court has held that a state is not a 'person' who can be sued under § 1983." *Carmody*, 893 F.3d at 403, citing *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989).

However, official capacity suits against state officials that seek only injunctive relief are permitted by § 1983, and not forbidden by the Eleventh Amendment. *Power v. Summers*, 226 F.3d 815, 819 (7th Cir. 2000), citing *Will*, 491 U.S. at 71 n.10; *Carmody*, 893 F.3d at 403. There are three exceptions to this defense that may subject a state to an action in federal court: (1) where Congress, acting under its constitutional authority conveyed by amendments passed after the Eleventh Amendment (the most common being the Fourteenth Amendment), abrogates a state's immunity from suit; (2) where the state itself consents to being sued in federal court; and (3) under the doctrine articulated by the Supreme Court in *Ex parte Young*, 209 U.S. 123 (1908). *Council 31 of the American Federation of State, County, and Municipal Employees, AFL-CIO v. Quinn*, 680 F.3d 875, 882 (7th Cir. 2012). Here, the first two exceptions are not applicable so the court need address only the third exception—the *Ex parte Young* doctrine.

The *Ex parte Young* doctrine allows private parties to sue individual state officials for prospective relief to enjoin ongoing violations of federal law, in which the court conducts "a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Council 31*, 680 F.3d at 882.

27

First, with regard to Plaintiff's March 27, 2017, housing contract termination and her November 3, 2017, initial dismissal from the University, Defendants argue that those matters are not "ongoing violations" of federal law because both claims were resolved by the University in her favor: Plaintiff's appeal on the eviction was granted, and she was moved to a new dorm on campus, and eventually a new room in that dorm that suited her requested accommodations; and Plaintiff was reinstated to the University, mooting the initial dismissal as an "ongoing" violation. The court agrees. "Because injunctive relief looks to the future, and is designed to deter rather than punish, relief will be denied if the conduct has been discontinued on the ground that the dispute has become moot and does not require the court's intervention." *Love v. Illinois Department of Corrections*, 2020 WL 1237200, at *4 (N.D. Ill. Mar. 13, 2020), quoting 11A Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2942 (3d ed. 2019). These resolved or mooted claims can be addressed by damages, which look back, as opposed to injunctive relief, which looks to the present or future. See *Love*, 2020 WL 1237200, at *4. Thus, Plaintiff's due process claims are dismissed against Defendants in their official capacities in this regard.

This leaves Plaintiff's due process claim relating to her August 6, 2018, dismissal from the University. Plaintiff argues that she is seeking prospective injunctive relief for an ongoing violation of federal law in this regard, because her dismissal is still in effect and she is seeking reinstatement to the University. Plaintiffs may pursue § 1983 claims against state university defendants in their official capacities when the relief they are

seeking is reinstatement as a student.  See *Carmody v. Board of Trustees of the University of Illinois*, 2015 WL 13675382, at *8 (C.D. Ill. Nov. 17, 2015), citing *Kashani v. Purdue University*, 813 F.2d 843, 848 (7th Cir. 1987).

Defendants argue that Plaintiff, in her Amended Complaint, has not alleged that she wants reinstatement to the University.  While Plaintiff has not specifically used the word "reinstatement" in her Amended Complaint, she did state that she "has shown express intent on continuing to be associated with the University by informing a University official of her intention and wish to apply to the Graduate School..."  The court finds, taking all inferences in her favor, that she has sufficiently plead her wish to be reinstated.

Defendants next argue that "Plaintiff fails to allege that she is currently ineligible to seek reinstatement to her former undergraduate program or admission to a graduate program without court involvement; the dismissal period has expired for the discipline imposed over two years ago."

In *Mutter v. Rodriguez*, 700 Fed.Appx. 528 (7th Cir. Aug. 21, 2017), the Seventh Circuit dismissed the plaintiff's claim that university officials were violating federal law by not reinstating him at school, writing:

> Mutter's complaint alleges that UIC expelled him in 2013 but granted him the "opportunity to reinstate in 2015." Thus as was true in a similar case, the expulsion was "only for two years, and the two years are up, so that there is, at least as far as the record discloses, no obstacle to his being readmitted." See *Osteen v. Henley*, 13 F.3d 221, 223 (7th Cir. 1993). That renders the case moot. See *id.* Rodriguez and Kennedy are no longer denying Mutter's asserted "right" to apply for readmission because by his own account he is and has been eligible to reinstate without court involvement. See *id.*; see also *Ozinga v. Price*, 855 F.3d 730, 734–35 (7th Cir. 2017) (noting that for a complaint requesting prospective relief, when the

"complained-of defect" is removed, the case should be dismissed as moot); *Vinson v. Vermilion County*, 776 F.3d 924, 929 (7th Cir. 2015) (noting that a complaint can plead itself "out of court" by including facts that establish an "impenetrable defense" to claims).

*Mutter*, 700 Fed.Appx. at 530-531.

Here, Plaintiff has not plead herself out of court by alleging that the University will allow her to apply for readmission. However, Plaintiff has also not alleged that the University is currently *barring* her from readmission. In considering a Rule 12(b)(1) motion, the court may look beyond the allegations of the complaint, and "may resolve factual disputes and make any findings necessary to determine the court's adjudicatory competence." *Craftwood II*, 920 F.3d at 481. Defendants assert that the dismissal period has expired for the discipline imposed over two years ago. Therefore, because Plaintiff has not alleged the University is barring her from applying for readmission, the issue is moot, and the court must therefore grant the Rule 12(b)(1) motion to dismiss with regard to the individual Defendants in their official capacities on the 2018 dismissal claim. See *Mutter*, 700 Fed.Appx. at 530-31.

<u>Count II: First Amendment Violations</u>

Defendants reiterate their arguments from the due process section in their arguments on the First Amendment. Plaintiff does not dispute that the Board is immune from suit for the First Amendment violations. For the same reasons as in the prior section, the Board is dismissed as a defendant in Count II for lack of subject matter jurisdiction.

30

Plaintiff contends that *Ex parte Young* applies to the First Amendment claims for the same reason as in the due process claims: she intends to apply for reinstatement at the University.  Defendants argue that, even if she seeks reinstatement, she is not premising her First Amendment claims on her August 2018 dismissal from the University.  Indeed, subsections (a) through (h) of Count II do not mention her August 2018 dismissal from the University, and Plaintiff makes no argument as to how the allegations in Count II represent a *continuing* violation of federal law.  Defendants' motion is granted as to Defendants in their official capacities on Count II.

Counts III and IV: Discrimination and Accommodation Under FHA, <u>Rehabilitation Act, and ADA</u>

Defendants argue that Plaintiff's claims under the FHA and ADA in Counts III and IV against the Board and individual Defendants in their official capacities are barred by the Eleventh Amendment.  Although the Seventh Circuit has not explicitly held that states have sovereign immunity from FHA claims, other courts have so held. In *McCardell v. U.S. Department of Housing and Urban Development,* 794 F.3d 510 (5th Cir. 2015), the Fifth Circuit dismissed an FHA claim against the Texas state defendants because, it found, there was no evidence that Congress intended to abrogate states' sovereign immunity in the enactment of the FHA.  *McCardell*, 794 F.3d at 521-22; see also *Thomas v. Butzen*, 2005 WL 2387676, at *3 (N.D. Ill. Sept. 26, 2005) (FHA claim against State of Illinois barred by Eleventh Amendment).  Plaintiff does not respond to Defendants' argument on the FHA, and thus it can be inferred that Plaintiff concedes the argument.  "A party's failure to respond to arguments the opposing party makes in a motion to dismiss operates as a waiver or forfeiture of the claim and an abandonment

of any argument against dismissing the claim." *Jones v. Connors*, 2012 WL 4361500, at *7

(N.D. Ill. Sept. 20, 2012), citing *Alioto v. Town of Lisbon*, 651 F.3d 715, 719 n.1, 721 (7th

Cir. 2011) (forfeiture occurs where the "litigant effectively abandons the litigation by

not responding to alleged deficiencies in a motion to dismiss").  Plaintiff's claims under

the FHA in Counts III and IV are hereby dismissed against the Board and the

individual Defendants in their official capacities.

Next, concerning the ADA, Plaintiff argues that her claims against the Board and

Defendants in their official capacities should survive because *Ex parte Young* authorizes

suits for prospective injunctive relief against state officials sued in their official

capacity.  Plaintiff, however, does not state how any allegation in Counts III or IV

supports an "ongoing violation" of federal law.  To the extent Plaintiff's claims against

the Board and individual Defendants in their official capacities is premised on the

"ongoing violation of federal law" exception, Plaintiff's claim is dismissed on that

ground.

Plaintiff also notes that claims for money damages under Title II of the ADA

may survive on claims where the ADA claims involve actual constitutional violations.

See *United States v. Georgia*, 546 U.S. 151, 159 (2006) ("insofar as Title II creates a private

cause of action for damages against the States for conduct that actually violates the

Fourteenth Amendment, Title II validly abrogates state sovereign immunity.").

Plaintiff argues that the ADA claims in Counts III and IV are related to the

constitutional due process and freedom of speech claims in Counts I and II.  Defendants

32

respond that Plaintiff merely states the general rule from the Supreme Court's *Georgia* decision and makes no argument to show that the rule applies in this case.

The Seventh Circuit dealt with a similar claim in *Brewer v. Wisconsin Board of Bar Examiners*, 270 Fed.Appx. 418 (7th Cir. Mar. 13, 2008).  In that case, the plaintiff, who had a mental disability, sued various state agencies because the Board of Bar Examiners refused to act on her bar exam application because she would not pay $2,000 to undergo a psychological evaluation, and refused to consider affidavits from former employers and law school professors who would attest to her fitness to practice law. She sued for violations of her constitutional rights under § 1983, violations of Title II of the ADA, and violations of the Rehabilitation Act.  The district court rejected the plaintiff's ADA claims on the ground that the Board was immune from suit because the ADA does not abrogate state immunity for claims challenging attorney-licensing practices.

The Seventh Circuit affirmed.  The court noted that Supreme Court precedent held "only that in enacting the ADA, Congress had identified a history and pattern of unconstitutional discrimination against the disabled with respect to their fundamental right of access to the courts ... and by doing so had validly abrogated state immunity for such claims[,]" but noted that the plaintiff did "not argue that Congress has ever identified a history and pattern of unconstitutional discrimination against the disabled in the administration of attorney-licensing schemes. It has not."  *Brewer*, 270 Fed.Appx. at 421.

33

Likewise in the instant case, the court agrees with Defendants that, aside from a brief, one-sentence mention that her ADA claims are related in some way to her due process and speech claims, Plaintiff has not argued that Congress ever identified a history and pattern of unconstitutional discrimination against the disabled in assigning students to residence halls or disciplining them for misconduct, and thus her claims against the Board and individual Defendants in their official capacities under the ADA must be dismissed pursuant to Rule 12(b)(1).  See *Brewer*, 270 Fed.Appx. at 421.

Counts V, VI, and VII: State Law Claims

Defendants argue that all of Plaintiff's state law claims must be dismissed for lack of jurisdiction based on sovereign immunity, the Illinois State Lawsuit Immunity Act (745 Ill. Comp. Stat. 5/1 et seq.), and the Illinois Court of Claims Act (705 Ill. Comp. Stat. 505/1 et seq.).

Plaintiff, on page 25 of her Response (#43), concedes that section 505/8 of the Court of Claims Act bars the tort claims against the Board and Defendants in their official capacity.  Thus, to the extent Counts V and VI are alleged against the Board and/or Defendants in their official capacity, those claims are dismissed.  Plaintiff argues that the contract claim against the Board and the individual capacity claims against Defendants on the assault and intentional infliction of emotional distress claims survive.      With regard to the contract claim in Count VII, Plaintiff argues that the claim survives under supplemental jurisdiction, 18 U.S.C. § 1367, because it is identical to the

claims Plaintiff has brought under § 504 of the Rehabilitation Act, and that the state "is contractually bound to respect the rights protected in the Act, [which] results in a waiver of sovereign immunity because the state chose to accept funds for its university programs."

The Court of Claims Act does not bar a contract claim against the State of Illinois where the plaintiff alleges a constitutional or federal statutory law basis for the contract claim, even if the plaintiff seeks only damages. See *Salaita v. Kennedy*, 118 F.Supp.3d 1068, 1091-92 (N.D. Ill. 2015). Here, Plaintiff does not list any injunctive relief requested in relation to the contract claim in Count VII, but does allege a federal statutory basis for the claim: § 504 of the Rehabilitation Act. Thus, Defendants' motion is denied on this ground.

As to the assault and intentional infliction of emotional distress claims in Counts V and VI, respectively, Plaintiff alleges those claims are brought against the individual Defendants in their individual capacities only. Defendants, at page 13 of their Reply (#46), concede that, as Plaintiff now specifically disavows any claim of institutional liability on those claims, the court has jurisdiction to hear them.

Therefore, on jurisdictional grounds, the claims against the Board and individual Defendants in their official capacities survive as to the Rehabilitation Act claims in Counts III and IV and the contract claim in Count VII. This court also has subject matter jurisdiction over the assault and intentional infliction of emotional distress claims against the individual Defendants in Counts V and VI.

All other claims against the Board and individual Defendants in their official capacities are dismissed for the reasons explained above.

*Dismissal Under Rule 12(b)(6)*

<u>Count I: Due Process</u>

Defendants argue that Plaintiff cannot state a claim for violation of her due process rights because she has no property interest in her education or housing contract, and, even if she does have a property interest, she was not denied due process.  Plaintiff responds that she has a property interest in her housing contract, which was broken when she was evicted from Allen Hall, and that she was denied due process because she was given no meaningful opportunity to be heard.

The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1.  There are two steps to any procedural due process analysis: (1) the court must identify the protected property or liberty interest at stake; and (2) it must determine what process is due under the circumstances.  *Charleston v. Board of Trustees of University of Illinois at Chicago*, 741 F.3d 769, 772 (7th Cir. 2013).  "Although the Fourteenth Amendment protects property rights, it does not create them.  Instead, property rights are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Price v. Board of Education of the City of Chicago*, 755 F.3d 605, 607 (7th Cir. 2014).

36

Seventh Circuit precedent on due process claims in the context of university discipline has focused on whether a student has a protected property interest in his education at a state university, "asking 'whether the student has shown that he has a legally protected entitlement to his continued education at the university.'" *Doe v. Purdue University*, 928 F.3d 652, 659 (7th Cir. 2019), quoting *Charleston*, 741 F.3d at 773. For higher education purposes, any property interest is a matter of contract between the student and the university, and to demonstrate that she possesses the requisite property interest, a university student must do more than show that she has a contract with the university; she must establish that the contract entitled her to the specific right that the university allegedly took, such as the right to a continuing education or the right not to be suspended without good cause. *Doe*, 928 F.3d at 660. "Generalities won't do; 'the student's complaint must be specific about the source of this implied contract, the exact promises the university made to the student, and the promises the student made in return.'" *Doe*, 928 F.3d at 660, quoting *Charleston*, 741 F.3d at 773.

Here, Plaintiff argues that she has a property interest due to a contractual promise from the University to her in the form of her housing contract and promises made by the University to her regarding commitments to abide by federal non-discrimination law and freedom of inquiry protections and its own non-discrimination policy in the Student Code (see Plaintiff's Response (#43), p. 11). In return, Plaintiff argues, her promise was to abide by the Student Code and pay the required fees.

This is not enough to create a contractual promise for a property interest. Plaintiff has not cited to any specific portion of the Student Code, or a standalone document, for the housing contract entitling her to housing in Allen Hall.  Further, Plaintiff's conclusory allegations that the University violated its promise to abide by federal non-discrimination law and its own non-discrimination policies, as well as abide by First Amendment freedom of inquiry ideals, does not constitute a specific contractual right sufficient to create a property interest.  As will be explained in the section below on Plaintiff's state law contract claims (Count VII), no independent contractual relationship is created by an alleged promise to abide by federal non-discrimination laws, as the University is already bound to abide by such laws.  In any event, general references to a college's policies are insufficient to identify a property interest.  See *Preston v. Board of Trustees of Chicago State University*, 2015 WL 327369, at *8 (N.D. Ill. Jan. 26, 2015).  Rather, Plaintiff must allege the contract entitled her to the specific right that the university allegedly took, because "[g]eneralities won't do."  *Doe*, 928 F.3d at 660.  Plaintiff has not done that here.

Even if Plaintiff can sufficiently allege a property interest with regard to housing, she received all the process she was due.  "When a right is protected by the Due Process Clause, a state 'may not withdraw [it] on grounds of misconduct absent[ ] fundamentally fair procedures to determine whether the misconduct has occurred.'" *Doe*, 928 F.3d at 663, quoting *Goss v. Lopez*, 419 U.S. 565, 574 (1975).  Determining what is fundamentally fair is always a context-specific inquiry.  *Doe*, 928 F.3d at 663.  "Thus, for example, a university has much more flexibility in administering academic standards than its code of conduct. And even in the disciplinary context, the process

38

due depends on a number of factors, including the severity of the consequence and the level of education. A 10-day suspension warrants fewer procedural safeguards than a longer one, and universities are subject to more rigorous requirements than high schools[.]" *Doe*, 928 F.3d at 663 (internal citations omitted).

With regard to Plaintiff's "eviction" from Allen Hall, Defendants argue that Plaintiff received all the process due because her appeal was allowed and she was eventually moved to another dormitory on campus.  See *Doe v. Cummins*, 662 Fed.Appx. 437, 447 (6th Cir. Dec. 6, 2016) (to the extent that the plaintiffs based their due process claims on alleged defects in their first hearings, those alleged errors were harmless because their appeals were sustained and they both received new hearings; thus, although both plaintiffs alleged that numerous procedural deficiencies existed in their first hearings, those defects were cured by the university's decision to grant their appeals, vacate the finding of responsibility, and provide each a second hearing).

The court agrees with Defendants.  For whatever deficiencies were present in the March 27, 2017, termination of Plaintiff's housing contract and "eviction" from Allen Hall, Plaintiff appealed, and the appeal was granted and Plaintiff was rehoused in another dormitory.  Therefore, the motion is granted with respect to Plaintiff's due process claim.

Count II: First Amendment Violations

Before addressing Defendants' arguments in support of dismissing Count II, the court must determine what *type* of First Amendment claims Plaintiff is making. Plaintiff, in subsections (a) and (e) through (h) of Count II, is clearly making both retaliation and freedom of association claims. However, in subsections (b) through (d), Plaintiff could be read as making some kind of prior restraint allegation. Thus, the court will address the motion on those three types of First Amendment claims.

"Threatening penalties for future speech goes by the name 'prior restraint,' and a prior restraint is the quintessential first-amendment violation." *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009). "Prior restraint" describes administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur. *Milwaukee Deputy Sheriff's Association v. Clarke*, 574 F.3d 370, 382 (7th Cir. 2009). However, before any restriction may be unconstitutional, the speech in question must be protected by the First Amendment. *Milwaukee Deputy Sheriff's*, 574 F.3d at 382.

The court grants the motion with regard to subsection (d), Plaintiff's August 2, 2017, conversation with Sealine, because the actual words, stated by Sealine to Plaintiff, were that Plaintiff "should not engage in explicit sexual conversations without their consent." Sexually explicit conversations without the consent of the listening party, essentially sexual harassment, is not constitutionally protected speech. See, e.g., *Johnson v. County of Los Angeles Fire Dept.*, 865 F.Supp. 1430, 1439-40 n.5 (C.D. Cal. 1994) (Title VII prohibited male employee from manifesting sexually degrading thoughts in the form sexually degrading comments, and the county certainly had the power to regulate

lewd comments in the workplace via sexual harassment policy that bars, among other things, sexual remarks or profanities that have the effect of embarrassing another employee); see also *Rubin v. Ikenberry*, 933 F.Supp. 1425, 1435 (C.D. Ill. 1996) ("The Court finds that there is a rational relationship between a finding of sexual harassment and the University's objective of providing students with a healthy learning environment.").  Plaintiff may have "understood" Sealine to be talking about "kink or poly" as opposed to "trans or homosexuality," but what Plaintiff "understood" is not what Sealine actually said.  Sealine did not engage in any prior restraint of constitutionally protected speech on August 2, 2017.

Concerning the allegations in subsection (c), that Sealine in Summer-Fall 2017 told Plaintiff to not have conversations that made others uncomfortable and to avoid explicit sexual conversations, including self-identification as kinky or poly, the court finds Plaintiff has not pled a prior restraint violation.  Paragraphs 26 and 34 of the Amended Complaint make clear that Sealine was attempting to clarify for Plaintiff that she should obtain the consent of her peers when wishing to discuss sexual matters. Plaintiff does allege that at one point Sealine stated Plaintiff should not identify herself as kinky or poly to people, but clarified in a September 7, 2017, letter that she could identify kink and/or poly as orientations.  The context of Plaintiff's communications with Sealine, as pled in the Amended Complaint, exhibit that Sealine was advising

Plaintiff not to engage in sexually explicit conversations without first obtaining the consent of the other party, as opposed to an attempt by Sealine to threaten Plaintiff to prevent her from discussing her sexual orientation.

The allegation of prior restraint against Dean Mwilambwe is more straightforward: Plaintiff alleges that Mwilambwe explicitly stated that kink and polyamory were not to be referred to as "orientations," only "behaviors," and were not to be openly discussed.  The court finds that, for Rule 12(b)(6) purposes, Plaintiff has sufficiently stated a claim for prior restraint on this allegation.

Next, Plaintiff makes various allegations that Defendants retaliated against her for engaging in First Amendment-protected speech.  To state a First Amendment retaliation claim, a plaintiff must establish that (1) her speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against her; and (3) there was a causal connection between this adverse action and the protected speech. *R.Z. ex rel. Zimmer v. Carmel Clay Schools*, 868 F.Supp.2d 785, 796 (S.D. Ind. 2012), citing *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008).

In subsection (a), Plaintiff alleges that she was retaliated against when she engaged in protected speech by discussing her sexual identity with others when her housing contract was terminated by the University.  A person is engaging in protected speech when they state their sexual orientation.  See *Cook v. Gates*, 528 F.3d 42, 62 (1st Cir. 2008), citing *Hurley v. Irish-American Gay & Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574-75 (1992).  The termination of a housing contract could deter someone from exercising their rights under the First Amendment.  Defendants argue that Plaintiff was engaging in sexual speech with non-consenting listeners, and thus

Plaintiff had no First Amendment right to engage in speech with whomever she chose. At the pleadings stage, however, the court must take Plaintiff's allegations as true. Plaintiff alleges she was merely engaged in public speech, publicly identifying her sexual orientation, and she was punished for it by Defendants.  Thus, she has stated a First Amendment retaliation claim in subsection (a).

Plaintiff's allegations in subsections (e) through (h) concern the First Amendment right to freedom of association, specifically Plaintiff's freedom of expressive association.

The freedom of expressive association arises from the First Amendment and ensures the right to associate for the purpose of engaging in activities protected by the First Amendment.  *Shipley v. Chicago Board of Election Commissioners*, 947 F.3d 1056, 1063 (7th Cir. 2020).  To survive a motion to dismiss on a freedom of expressive association claim, a plaintiff must allege they were engaged in expressive activity.  *Kohlman v. Village of Midlothian*, 833 F.Supp.2d 922, 937 (N.D. Ill. 2011).

The court finds that, at this point of the litigation, taking all Plaintiff's allegations as true and drawing all inferences in her favor, she has stated a claim for freedom of expressive association with regard to being barred from meeting with her friend and from attending Queersgiving (subsection (e)), as she alleges that she was meeting with the friend to discuss protected speech on LGBT issues, and that the NCD against her only applied to verbal contact with Students A and B, and thus the University went beyond the NCD when it barred her from the Queersgiving event in its entirety. Again, the court passes no judgment on the merits of the claim.

The court grants Defendants' motion with regard to the allegations in subsection (f), as they do not allege what events Plaintiff was barred from, and how Plaintiff was engaged in expressive activity at those events.  For the same reasons the court grants the motion with regard to the allegations in subsection (g), as Plaintiff does not allege what expressive activities protected by the First Amendment she would have been engaging in at the public art show.  Finally, the court grants the motion as to the allegations in subsection (h), as Plaintiff herself admits that she was only barred from the LGBT and Women's Resource Centers when Students A and B, who had the NCD against her, were present at events, and she could also attend the Centers whenever she wanted by appointment.  "[T]he freedom of expressive association is not absolute; it can be overridden by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."  *Boy Scouts of America v. Dale*, 530 U.S. 640, 640-41 (2000).  No contact orders have been upheld in the face of freedom of association claims.  See *Zargapur v. Townsend*, 18 F.Supp.3d 734, 738 (E.D. Va. 2013).  Plaintiff was still able to attend those resource centers in compliance with the NCDs.

Qualified Immunity

Defendants argue that they are entitled to qualified immunity on both Plaintiff's due process and First Amendment claims.  Motions under Rule 12(b)(6) are not "always (if ever) the most suitable procedural setting to determine whether an official is qualifiedly immune, because immunity may depend on particular facts that a plaintiff need not plead to state a claim."  *Hansen v. LeVan*, 967 F.3d 584, 589 (7th Cir. 2020).  Here, further development of the factual record will better aid the court in determining

the nature of the alleged constitutional violations.  Thus, summary judgment is the more appropriate vehicle for deciding qualified immunity on Plaintiff's surviving claims.  Defendants' motion is denied on this ground.

Counts III and IV: Discrimination and Accommodation Under
FHA, § 504 of the Rehabilitation Act, or FHA

Defendants next argue that the Amended Complaint fails to state a claim under § 504, the ADA, or FHA.  First, the court agrees with Defendants that any claim against the individual Defendants in their individual capacities under the ADA and Rehabilitation Act must fail because those acts only authorize suits against public entities.  See *Brewer*, 270 Fed.Appx. at 421.  Thus, because the court has already dismissed the ADA claims against the Board and individual Defendants in their official capacities, the ADA claims are dismissed in their entirety.

This leaves the FHA claims against Defendants in their individual capacities, and the § 504 Rehabilitation Act claims against the Board and Defendants in their official capacities.

Plaintiff claims two instances of disability-based discrimination and failure to accommodate: (1) when she was evicted from University housing at Allen Hall in March 2017 and (2) her mistreatment in relation to the NCDs and the discipline meted out for violating the NCDs.  The court finds that Plaintiff has sufficiently stated discrimination claims and failure to accommodate claims under the Rehabilitation Act and FHA for purposes of Rule 12(b)(6).  The court makes no judgment on the merits of the claims.  Defendants may reraise their arguments at a later stage in the litigation when an appropriate factual record has been assembled and when the applicable

45

procedural rules permit more fulsome and searching analysis.  See *Peppers v. Credit One Bank, N.A.*, 2017 WL 11139919, at *2 (C.D. Ill. Dec. 18, 2017), quoting *Access 4 All, Inc. v. Chicago Grande, Inc.*, 2007 WL 1438167, at *1 (N.D. Ill. May 10, 2007).

Further, any punitive damages claim based on § 504 of the Rehabilitation Act are hereby stricken, as punitive damages are not available under that statute.  *Barnes v. Gorman*, 536 U.S. 181, 189 (2002).

<u>Counts V, VI and VII: State Law Claims</u>

First, the court addresses Plaintiff's assault claim in Count V.  To survive dismissal, an assault claim must include an allegation that the defendant's intentional conduct placed the plaintiff in reasonable apprehension of imminent battery.  *McNeil v. Carter*, 742 N.E.2d 1277, 1281 (Ill. App. Ct. 2001).  Illinois courts have held that words alone are not "usually" enough to constitute an assault, and even then the insertion of the word "'usually' was just an unnecessary hedge (there is such a thing as misstating the law by adding, out of an overabundance of caution, unnecessary qualifications)."  *Kijonka v. Seitzinger*, 363 F.3d 645, 647-48 (7th Cir. 2004).  Further, "a victim's fear, especially when provoked by the victim's own misconduct, cannot transform a remote threat into an assault."  *Kijonka*, 363 F.3d at 648.  "The cases that flirt with a gesture-free concept of assault make clear that the threat must be immediate."  *Kijonka*, 363 F.3d at 648.

The court finds instructive the district court's decision in *Bittman v. Fox*, 107 F.Supp.3d 896 (N.D. Ill. 2015).  In that case, the plaintiff, Bittman, alleged that on May 19, 2014, the Orland Park Public Library Board of Directors held a public meeting, which she, Fox, and DuJan attended.  Following a disruption caused by Fox, the plaintiff proceeded to the back of the meeting room to call the Orland Park Police Department. As the plaintiff dialed 9–1–1, DuJan and another male followed and approached her, which placed her in "apprehension of immediate, offensive contact." She responded by using her badge to enter an adjacent private meeting room.  Once the plaintiff was in the private meeting room, DuJan hung up the 9–1–1 call that the plaintiff initially placed.

The district court granted the defendant's motion to dismiss on the plaintiff's Illinois civil assault claim:

> Under this set of facts, the court finds that Bittman has failed to allege any conduct that would indicate DuJan was about to attack her. Bittman does not allege that DuJan made any verbal threats or menacing gestures. Rather, the only conduct that Bittman describes is that Dujan and another male "followed and approached" her across a public meeting room, and that he hung up the telephone after Bittman had entered a secure room. Given the history of DuJan's vitriolic campaign against the Orland Park Public Library's policy and his alleged harassment of Bittman, she may have feared that DuJan's actions may one day turn violent, "but a victim's fear ... cannot transform a remote threat into an assault." [citation omitted]. Bittmans's conclusory allegation that DuJan's conduct placed her in imminent apprehension of harmful and offensive contact is not supported by her factual allegations. Accordingly, Count VII for assault fails to state a claim upon which relief can be granted.

*Bittman*, 107 F.Supp.2d at 901-02.

Likewise in the instant case, Anton never threatened Plaintiff verbally, nor did Anton even make a threatening gesture.  Anton "approached" Plaintiff, but she did not charge at her, raise her hand, carry a weapon, or have a previous history of stalking or harassing Plaintiff.  Anton had been called to Allen Hall in her capacity as an associate director of housing.  Anton had been involved in Plaintiff's removal from Allen Hall in her official capacity as associate director of housing.  Anton's words to Plaintiff were not a threat or threatening.  Plaintiff states they were asked aggressively, but a victim's fear, especially when provoked by what Anton believed to be Plaintiff's own misconduct, cannot transform a remote threat into an assault, particularly when, as here, there is not even a remote threat.  See *Kijonka*, 363 F.3d at 648.  Although the court examines the emotional effect upon the putative victim, that response must be reasonable.  *People v. Floyd*, 663 N.E.2d 74, 75 (Ill. App. Ct. 1996).  It is not enough that the victim feels "petrified" that the defendant is going to harm her, as such feeling must have a measure of objective reasonableness.  *Floyd*, 663 N.E.2d at 75.

Plaintiff cites to the Illinois Appellate Court's decision in *Floyd*.  In that case, the appellate court overturned an assault conviction where the victim was standing on the street, listening to music on her "Walkman," when she noticed defendant, who was riding his bicycle, stop "kitty corner" from her and appeared to be "looking at railroad tracks."  The defendant then began to "stare" at her. After staring at her for "two or three minutes[,]" the defendant crossed the street on his bicycle and came to a stop next to her.  According to the victim, defendant then said, "[y]ou come here, you." An

investigating officer related only that the defendant said "come here you."  There is no evidence that defendant dismounted the bicycle or that he made any other physical or verbal threat to her.

The appellate court recited various examples of actions that constituted viable assault claims, such as: wielding a tire iron while using threatening words has been held an assault; a defendant, who took unkindly to the universal greeting of "the finger" on a highway was held liable when he threatened to "blow the head off" of the greeter as he opened his trunk apparently to retrieve a shotgun; and a woman confined to a wheelchair had reasonable apprehension where a large man approached her and verbally threatened her with bodily harm.  *Floyd*, 663 N.E.2d at 76.  The court also noted that, in circumstances where a victim has prior knowledge of the violent propensities of the aggressor, conduct which by itself would not allow a finding of reasonable apprehension of danger, may be inferred to cause that kind of response in the complainant to bring the matter within the penumbra of the statute.  *Floyd*, 663 N.E.2d at 76.  The court concluded:

> There is no dearth of examples and we do not minimize the fear engendered by Ms. Adams' encounter with defendant. However, we do not believe that the words used by defendant, even coupled with the fact that he rode his bicycle toward her, rises to the level of assault or that the degree of her apprehension was reasonable. Therefore, we find that the evidence of assault was so unreasonable or unsatisfactory as to create a reasonable doubt of defendant's guilt.

*Floyd*, 663 N.E.2d at 76.

49

Here, again, Plaintiff was never threatened by Anton. The allegations do not rise to the level of the examples described as constituting assault by the court in *Floyd*. While Plaintiff had prior knowledge of Anton's involvement in her original removal from Allen Hall, there is nothing alleged to suggest that Plaintiff knew of any "violent propensities" of Anton. Under the facts alleged, the court does not believe Anton's aggressive questioning of Plaintiff, coupled with the fact that she approached within five inches of Plaintiff's face, rises to the level of assault or that the degree of Plaintiff's apprehension was reasonable. See *Floyd*, 663 N.E.2d at 76. Plaintiff has not stated a claim for assault, and Defendants' motion must be granted on this ground. See *Contreras v. Suncast Corp.*, 129 F.Supp.2d 1173, 1182 (N.D. Ill. 2001).

In order to state a claim for intentional infliction of emotional distress in Illinois, a plaintiff must satisfy three requirements: "(1) the conduct involved must be truly extreme and outrageous; (2) the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress[;] and (3) the conduct must in fact cause severe emotional distress." *Lewis v. School District #70*, 523 F.3d 730, 746 (7th Cir. 2008), quoting *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001). The standard is "quite high," and "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Lewis*, 523 F.3d at 746-47. "In order to meet the threshold for intentional infliction of emotional distress, the defendant's conduct must extend beyond the bounds of human decency and be considered intolerable in a civilized community." *Lewis*, 523 F.3d at 747. To determine whether the conduct alleged is extreme and outrageous, we employ an objective standard, taking into

50

consideration the particular facts of the case.  *Lewis*, 523 F.3d at 747.

The Seventh Circuit, in *Lewis*, cited a number of examples of cases where the conduct alleged was found to constitute intentional infliction of emotional distress: *Patterson v. Xerox Corp.*, 901 F.Supp. 274, 279 (N.D. Ill. 1995) (involving the persistent harassment of a pregnant employee by her supervisor, including the berating of the employee for absence from work while the employee was hospitalized for premature labor); *Pavilon v. Kaferly*, 561 N.E.2d 1245, 1251 (Ill. App. Ct. 1990) (finding intentional infliction of emotional distress when an employer pressured an employee for dates, offered her money in return for sexual favors, and threatened to kill and rape her); *Milton v. Ill. Bell Tel. Co.*, 427 N.E.2d 829, 832 (Ill. App. Ct. 1981) (involving an employer who engaged in an extensive course of disciplinary and harassing conduct to coerce the plaintiff to falsify work reports in violation of the law).

The conduct alleged by Plaintiff in the Amended Complaint, objectively considered, does not constitute intentional infliction of emotional distress, especially as it does not come close to the level of conduct involved in the cases cited by the Seventh Circuit in *Lewis*.  Under the allegations, Defendants' conduct may be alleged to be discriminatory, capricious, vaguely threatening, or insensitive, but it cannot be said to "extend beyond the bounds of human decency and be considered intolerable in a civilized community."  See *Lewis*, 523 F.3d at 747.  Defendants' motion is granted on this ground.

51

Finally, Plaintiff's breach of contract claim in Count VII raises four bases for breach: (1) University housing's failure to honor her two consecutive twelve-month lease contracts for 2017-2018; (2) for refusing to refund her payment for University housing she had not been allowed to use, for overcharging her for housing and refusing to refund the proper amount until after repeated grievances; (3) for the original eviction from Allen Hall based on biases and disability discrimination under various federal laws and statutes, without engaging in the interactive process; and (4) for first opting to evict Plaintiff rather than relocate her as part of a Title IX investigation as procedure mandates.

An Illinois breach of contract claim requires that a plaintiff allege: (1) the existence of a valid and enforceable contractual promise, (2) a breach of that promise, (3) plaintiff performed her contractual obligations, and (4) resultant damages. *Doe v. Columbia College Chicago*, 933 F.3d 849, 858 (7th Cir. 2019). "A college and its students have a contractual relationship and its terms are set forth in the school's catalogues and bulletins." *Doe*, 933 F.3d at 858.

As an initial matter, the court grants the motion with regard to subsection (b), concerning the refunds, as Plaintiff was eventually refunded the full amount sought, and thus cannot establish damages on that claim.

Next, Defendants argue that Plaintiff cannot premise her breach of contract claim on Defendants' alleged failure to follow state and federal anti-discrimination law. Defendants, citing to the Illinois Appellate Court's decision in *Harris v. Adler School of Professional Psychology*, 723 N.E.2d 717 (Ill. App. Ct. 1999), argue that student contract claims cannot be based upon general references to non-discrimination law in student

handbooks, as those provisions are references to the applicability of an already existing law, and "[t]he promise to do something one is already legally obligated to do is not consideration, and no new obligation is thereby created."  *Harris*, 723 N.E.2d at 722.

Plaintiff responds that *Harris* just referred to "general references," and she is referring to specific promises from the University to adhere to federal and state anti-discrimination law.  In addition, Plaintiff argues that, since the University receives federal funding, it has waived its Eleventh Amendment immunity, and the waiver is consideration for the funds.  Plaintiff argues 34 Code of Federal Regulations § 104.4(a) also creates a contractual scenario via the University's acceptance of federal funds, where the students are third-party beneficiaries of the University's promise not to discriminate in order to be eligible for the funding.

The court finds instructive the recent decision of the district court in *Doe v. McHenry County College*, 2020 WL 5209834 (N.D. Ill. Sept. 1, 2020).  In *Doe*, the plaintiff alleged that she had a contractual relationship with her college embodied in the student code, and the college breached the student code by discriminating against her and not providing her a reasonable accommodation.  Specifically, the provision the plaintiff relied on in the student code stated: "In compliance with the ... Americans with Disabilities Act, ... the College prohibits discrimination and harassment based on ... disability."

The district court dismissed the plaintiff's breach of contract claim.  The court began its analysis by noting that a promise to do something one is already obligated to do is no consideration and creates no new obligation, and cited the *Harris* court's holding that "'the racial-discrimination provision [in the student catalog] was only a general reference of adherence to existing law concerning discrimination,' and was not 'an independent contractual obligation.'" *Doe*, 2020 WL 5209834, at *5.  The court concluded that "[t]he statement by the College that it prohibits discrimination and harassment based on disability in compliance with the ADA is a general statement of compliance with existing anti-discrimination law. It did not give rise to a specific independent contractual obligation." *Doe*, 202 WL 5209834, at *5.

The court also rejected the plaintiff's argument citing 34 C.F.R. § 104.4(a), that she was a third-party beneficiary to the college's contractual arrangement to receive federal funds from the government, finding that the plaintiff "has not cited any authority that supports her argument that the College's receipt of federal funding means that she can sue the College for breach of contract under state law as a 'third-party beneficiary'." *Doe*, 2020 WL 5209834, at *6.

In the instant case, Plaintiff cites to § 1-104(a) and 1-108 of the Student Code to support her argument that the University specifically referenced and "precisely incorporated" Title IX, the ADA, FHA, and other federal and state discrimination laws into the Code.  Section 1-104(a) states, in a general form, that "[m]embers of the University community have the same rights of privacy as other citizens and surrender none of those rights by becoming members of the academic community."  Section 1-108 sets forth the University's non-discrimination policy, stating that it is University policy

54

not to discriminate on the basis of, among other things, disability and sexual orientation, and the University complies with "all federal and state nondiscrimination, equal opportunity, and affirmative action, laws, orders, and regulations."  The only specific reference to Title IX, the ADA, or § 504 comes in subsection (d) of § 1-108, which states "For additional information on Title IX, ADA, or 504, please contact the Title IX Coordinator at the Title IX and Disability Office[,]" and provides the contact information for said coordinator.

Like in *Doe*, the language in the University's Student Code consists of general statements of compliance with existing non-discrimination law.  If anything, the statements of compliance are even more general, as they do not reference specific federal or state laws in stating their compliance.  The only mention of specific federal laws are in a provision directing students with questions about those laws to the contact information for the Title IX coordinator.  The statements certainly do not give rise to specific independent contractual obligations.  See *Doe*, 2020 WL 5209834, at *5. Plaintiff's C.F.R. argument is also rejected, for the same reasons stated by the court in *Doe*.  See *Doe*, 2020 WL 5209834, at *6.  Thus, Defendants' motion on Count VII must be granted.

*Conclusion*

Defendants' Amended Motion to Dismiss (#28) is GRANTED in part and DENIED in part.  On jurisdictional grounds, the claims against the Board and individual Defendants in their official capacities survive only as to the Rehabilitation Act claims in Counts III and IV, and the state law contract claims in Count VII.  All other claims against the Board and individual Defendants in their official capacities are

dismissed, for the reasons stated in this Order.  Further, Defendants' motion is granted on Rule 12(b)(6) grounds on all counts except Counts III and IV, which survive in their entirety, and subsections (a), (b), and (e) of Count II.  Those claims survive.  Any request for punitive damages under § 504 of the Rehabilitation Act is stricken.

The court would also note that, to the extent Plaintiff elects to attempt to replead her complaint, she must be very specific as to each allegation, the legal basis for the allegation, and against whom and in what capacity the allegation is plead.

IT IS THEREFORE ORDERED:

(1)     Defendants' Motion to Dismiss (#28) is GRANTED in part and DENIED in part.

(2)     This matter is referred to the magistrate judge for further proceedings in accordance with this Order.

ENTERED this ___26th___ day of ___October_____, 2020.

s/Colin S. Bruce
_____
COLIN S. BRUCE
U.S. DISTRICT JUDGE